## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| JENNIFER STEKETEE, for herself and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); TYCO FIRE PRODUCTS, L.P., successor-in-interest to The Ansul Company; JOHNSON CONTROLS INTERNATIONAL, PLC; CHEMGUARD, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAX CORPORATION; CLARIANT CORPORATION; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; CHEMICALS, INC.; and KINGSWAY INDUSTRIES, INC. (f/k/a Tri-Max KCAF Fire Technologies),<br><br>Defendants. | Civil Action No. _____<br><br>**NOTICE OF REMOVAL**<br><br>**JURY TRIAL DEMANDED** |

Defendant 3M Company ("3M"), by and through undersigned counsel, hereby gives notice

of the removal of this action, pursuant to 28 U.S.C. §§ 1332(d), 1442(a)(1), 1446, and 1453, from

the First Judicial District Court of Santa Fe County, New Mexico to the United States District

Court for the District of New Mexico. 3M is entitled to remove this action based on federal officer

jurisdiction under 28 U.S.C. § 1442(a)(1). In the alternative, 3M is also entitled to remove this

1

action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA"). As further grounds for removal, 3M states as follows:

## PRELIMINARY STATEMENT

1.     Plaintiff Jennifer Steketee ("Plaintiff" or "Steketee") purports to bring this action on her own behalf and on behalf of a putative class to hold 3M and certain other Defendants liable based on their alleged conduct in supplying, manufacturing, marketing, selling, and/or distributing aqueous film-forming foams ("AFFF") that Plaintiff alleges contaminated her and putative class members' water supplies and residential real property. The putative class allegedly would include "[a]ll persons who own residential properties in the geographic area defined as La Cieneguilla and La Cienega communities south of Santa Fe, New Mexico . . . ." (Ex. A, Class Action Complaint for Property Related Damages and Demand for Jury Trial ("Complaint"), ¶¶ 259-61; *see also id.*, App'x A (describing the putative "Class Geographic Area").)

2.     The Complaint alleges that per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), were contained in Defendants' AFFF. (Ex. A., Compl. ¶¶ 2, 3-5.) Moreover, the Complaint alleges that "[f]or decades the Defendants manufactured and sold AFFF, a firefighting suppressant, to the United States Army ('Army'), including New Mexico Army National Guard, Santa Fe Army Aviation Support Facility ('Santa Fe AASF'), as well as airports such as the Sanat [sic] Fe Regional Airport ('SFR Airport'), and fire departments such as the City of Santa Fe Fire Department in Santa Fe County, New Mexico." (*Id.* ¶ 3.) The Complaint alleges that Plaintiff's and putative class members' "household water supplies have been contaminated" by PFAS that "migrated into the groundwater surrounding SFR Airport and Santa Fe AASF and contaminated private wells used to provide household water supplies to properties in the Class Area." (*Id.,* ¶¶ 7,

9.) The Complaint alleges that Plaintiff and putative class members "owned and/or used private drinking wells within the Class Area, and were exposed to and ingested" PFAS "for at least one year over the past five decades from SFR Airport and Santa Fe AASF's use of Defendants['] AFFF." (*Id.*, ¶ 13; *see also*, *e.g.*, *id.*, ¶ 14 ("Plaintiff Jennifer Steketee is an owner and occupant of real property using a private household well" and "has consumed and used water from her well for household purposes").) The Complaint alleges that Plaintiff's and putative class members' purported harms were caused by contamination by "PFAS . . . that Defendants used in their AFFF [that] migrated into the groundwater surrounding SFR Airport and Santa Fe AASF and contaminated private wells used to provide household water supplies to properties in the Class Area." (*Id.*, ¶ 9; *see also*, *e.g.*, *id.*, ¶ 3).

3.     The Complaint asserts claims against all Defendants, including 3M, for nuisance (*id.* ¶¶ 275-87), negligence (*id.* ¶¶ 288-302), negligent failure to warn (*id.* ¶¶ 303-16), defective product – defective design (*id.* ¶¶ 317-27), trespass (*id.* ¶¶ 328-35), and unjust enrichment (*id.* ¶¶ 336-43), and seeks "compensation for decrease in the value and marketability of the property and property rights of Plaintiff owners and the Class Member owners"; "the need for and cost of remediation of class properties and/or mitigation systems for those properties, and the costs incurred for alternative water"; "compensation for the loss of use, loss of use and enjoyment of their properties, and their annoyance, discomfort, and inconvenience"; "disgorgement of the profits and savings" allegedly "obtained by the unjust enrichment of Defendants through their use of and at the expense of the properties of Plaintiff and the Class Members";  "exemplary damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future"; and attorneys' fees, costs, and pre-judgment and post-judgment interest. (Ex. A, Compl., ¶¶ 345-46; *id.*, pp. 64-65 ("Prayer For Relief").)

4.      At least some of the AFFF that gives rise to the asserted claims has been manufactured by a select group of federal contractors (including 3M) in accordance with the military's rigorous specifications ("MilSpec AFFF"). According to the Complaint's own allegations in the Complaint, the alleged injuries stem at least in part from AFFF used at by the military in New Mexico. Since around 1970, all AFFF used at military facilities has been required to be MilSpec AFFF appearing on the Department of Defense ("DOD") Qualified Products List. Under the federal "government contractor" defense recognized by the U.S. Supreme Court in *Boyle v. United Technologies. Corp.*, 487 U.S. 500 (1988), 3M is immune to tort liability for its design and manufacture of MilSpec AFFF and for its provision of warnings related to MilSpec AFFF.

5.      3M is entitled to remove this action under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), to have its federal defense adjudicated in a federal forum. Numerous courts, including the court overseeing the *In re AFFF Products Liability Litigation* MDL ("MDL") in the District of South Carolina, have held that AFFF manufacturers properly removed cases on the ground that the plaintiffs' claims plausibly arose at least in part from MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard*, No. 1:20-cv-1080, 2021 WL 744683, at *4 (W.D. Mich. Jan. 6, 2021); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.* ("*In re AFFF*"), No. 2:18-mn-2873, 2019 WL 2807266, at *2 (D.S.C. May 24, 2019) ("*AFFF I*"); *Ayo v. 3M Comp.*, No. 18-cv-0373, 2018 WL 4781145, at *6-15 (E.D.N.Y. Sept. 30, 2018). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

. . .

. . .

## BACKGROUND

6.       This action was filed on March 6, 2024, in the First Judicial District Court of Santa Fe County, New Mexico, where it is docketed as Case No. D-101-CV-2024-00569. (Ex. A, Complaint and Summons.) Venue is proper in this Court pursuant to 28 U.S.C. § 1441(a) because the First Judicial District Court of Santa Fe County, New Mexico, is located within the District of New Mexico.

7.       Pursuant to 28 U.S.C. § 1446(a), Exhibit A hereto contains true and correct copies of all process, pleadings, and orders served on 3M in the state court action, and in compliance with L.R. 81.1(a), Exhibit A also contains legible copies of the remaining state court records and proceedings.

8.       This Notice of Removal is timely because it was filed within 30 days of April 24, 2024, the date on which 3M was served with the Complaint and Summons.  *See* 28 U.S.C. § 1446(b).

9.       3M is not required to notify or obtain the consent of any other Defendant in this action in order to remove this action as a whole under § 1442(a)(1) or under § 1453(b). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Linden v. Chase Manhattan Corp.*, No. 99 Civ. 3970(LLS), 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v. CBS News*, 854 F. Supp. 245, 246 n.2 (S.D.N.Y. 1994)

10.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon all parties to this action, and a copy is being filed with the Clerk of the First Judicial District Court of Santa Fe County, New Mexico.

11.      By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person,

or venue; and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

12.     3M reserves the right to amend or supplement this Notice of Removal.

13.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(A)(1)

14.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority, and those actions have a nexus with the plaintiff's claims; and (c) it can assert a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124-25, 129-31, 133-35 (1989); *Bd. of Cnty. Comm'rs. of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022); *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 296 (5th Cir. 2020); *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 254 (4th Cir. 2017); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135; *see also* 28 U.S.C. § 1442(a)(1) (providing for the removal of actions against the United States and its agencies and officers when the actions are "for or relating to any act under color of such office").

15.     Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal

forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011). This important federal policy "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." Willingham v. Morgan, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 as a whole must be "liberally construed" in favor of removal. *Durham*, 445 F.3d at 1252 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)). All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's alleged injuries are caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against manufacturers and holding that, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF[,] . . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against 3M and other manufacturers of MilSpec AFFF). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that plaintiffs' injuries are caused at least in part by MilSpec AFFF. *See* Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 103 (D.S.C. May 24, 2019) ("MDL Order 1") at 3–6; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2") at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3") at 3–6. Given its experience with the claims and defenses in AFFF litigation, the MDL

Court's holdings clearly demonstrate that this case, too, has been properly removed to federal court.[1]

A.   **MilSpec AFFF**

16.    Since the late 1960s or early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. Indeed, the United States Naval Research Laboratory developed AFFF—its researchers were granted an AFFF-related patent in 1966.[2] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

17.    The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command. The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[4] All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement. Prior to such listing, a manufacturer's products are examined, tested, and approved to be in conformance with specification requirements.[5] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements. After a

---

[1] Following removal, 3M intends to designate this action for transfer to the MDL.

[2] *See* U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[3] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[4] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[5] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[6] Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

18.     From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds expressly alleged to be at issue in the Complaint here.[7] The current MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[8] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS from AFFF "while still meeting all other military specification requirements."[9]

19.     The Complaint expressly alleges that Plaintiff's and putative class members' injuries have arisen in part from the use of AFFF by the military in New Mexico, including at the Santa Fe Army Aviation Support Facility ("Santa Fe AASF"). (Ex. A., Compl., ¶¶ 4, 13, 129-30, 134-36, 143-45, 225-33.) The Complaint alleges that "[f]or decades the Defendants manufactured

---

[6] *Id.*

[7] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[8] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[9] *Id.* § 6.6.

and sold AFFF . . . to the United States Army ('Army'), including New Mexico Army National

Guard, Santa Fe Army Aviation Support Facility . . . ." (*Id.* ¶ 3.) The Complaint alleges that "[f]or

decades," Santa Fe AASF "stored and used AFFF products as intended in fire suppression, annual

testing, and for other purposes," and that as a result, "PFAS components that Defendants used in

their AFFF migrated into the groundwater surrounding . . . Santa Fe AASF and contaminated

private wells used to provide household water supplies to properties in the Class Area." (*Id.* ¶ 9.)

The Complaint further alleges that "[a]s a direct and proximate result of the contaminated

groundwater and contaminated household water near . . . Santa Fe AASF, Plaintiff and the Plaintiff

Class have suffered annoyance and discomfort, loss of use and enjoyment of their properties,

certain costs of alternate water supply, and their property rights have been affected." (*Id.* ¶ 233.)

Since the 1970s, all AFFF used at such U.S. military facilities has been MilSpec AFFF. Pursuant

to contracts with the U.S. government, Defendants allegedly "supplied, manufactured, marketed,

sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use

in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise

discharged, and/or disposed at . . . Santa Fe AASF." (*Id.* ¶ 117.)

   20.   The claims asserted in this case therefore arise expressly from the use, storage, or

disposal of MilSpec AFFF by the military in New Mexico. Accordingly, 3M is entitled to remove

this case as a whole under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). As shown

below, all the elements of federal officer jurisdiction are met when a plaintiff asserts claims based

on alleged contamination caused by MilSpec AFFF.

   **B.**   **All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

      *1.*   *The "Person" Requirement Is Satisfied*

   21.   The first requirement for removal under the federal officer removal statute is

satisfied here because 3M (a corporation) is a "person" under the statute. For purposes of

§ 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting 1 U.S.C. § 1); *accord Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson*, 517 F.3d at 135-36.

### 2.   *The "Acting Under" Requirement Is Satisfied*

22.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 152 (2007); *Papp*, 842 F.3d at 812. The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer*, 860 F.3d at 255 (internal quotation marks omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813. Rather, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Sawyer*, 860 F.3d at 255.

23.    The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination that is the basis of Plaintiff's claims stems from MilSpec AFFF, a vital product provided by Defendants that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)). The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements

in formulations." Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, at 3–6 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5 (same); MDL Order 3, at 3–6 (same). If 3M and other manufacturers did not provide MilSpec AFFF for use at military bases, the government would have to manufacture and supply the product itself.

24.    In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted under the direction and control of one or more federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[10] Therefore, 3M has satisfied the "acting under" requirement. *See Nessel*, 2021 WL 744683, at *3; *Ayo*, 2018 WL 4781145, at *8-9.

### 3.    *The "Under Color Of Federal Office" Requirement Is Satisfied*

25.    The third requirement, that the defendant's actions were taken "under color of federal office," requires a "nexus" between plaintiff's claims and the defendant's acts undertaken at the direction of a federal officer. As with the "acting under" requirement, the "hurdle erected by" the requirement that the defendant's challenged actions were under color of federal office— sometimes called the nexus or connection requirement—"is quite low." *Isaacson*, 517 F.3d at 137.

---

[10] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

It is sufficient for a defendant to establish a connection or association between the lawsuit and the federal office. *See Sawyer*, 860 F.3d at 258 (explaining that 28 U.S.C. § 1442 permits removal of actions "for *or relating to* any act under color of [federal] office"); *Papp*, 842 F.3d at 813; *see also Isaacson*, 517 F.3d at 137-38 (explaining that it is sufficient if the act that allegedly caused or contributed to the plaintiff's injury occurred while the defendant was performing its official duties).[11]

26.     Here, Plaintiff's claims arise at least in part from 3M's production and sale of AFFF manufactured to military specifications for use at military facilities. Plaintiff alleges that the use of PFAS in AFFF is the source of her and putative class members' injuries The military specifications have expressly or implicitly required the use of PFAS in the product. As a result, the claims asserted in the Complaint against 3M relate to its acts taken under color of federal office. *See Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); *AFFF I*, 2019 WL 2807266, at *3 (nexus element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products that it claims [the defendant manufacturer] manufactured and sold, and for which the U.S. military imposes MilSpec standards."); *AFFF II*, at 5 (nexus element satisfied where AFFF products, "for which the military imposes MilSpec standards," were the alleged cause of plaintiff's injuries); *AFFF III*, at 5-6 (same).

27.     Courts "credit Defendants' theory of the case" when determining whether the requisite connection exists. *Isaacson*, 517 F.3d at 137; *accord Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"). As averred in this

---

[11] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

Notice of Removal, Plaintiffs' alleged injuries arise at least in part from MilSpec AFFF. Accordingly, Plaintiff's claims are "for or relating to" 3M's actions under color of federal office. 28 U.S.C. § 1442(a)(1).

        *4.*      <u>*The "Colorable Federal Defense" Requirement Is Satisfied*</u>

       28.     The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

       29.     At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (quoting *Kircher v. Putnam Funds Trust*, 547 U.S. 633, 644 n.12 (2006)); *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not determine credibility, weigh the quantum of evidence or discredit the source of the defense at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal quotation marks and citation omitted)). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783-84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant

should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (quoting *Willingham*, 395 U.S. at 409).

30.     Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512. 3M has alleged facts that satisfy these elements for purposes of removal.

31.     The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling. Those specifications are "reasonably precise," including in requiring the use of PFAS. In addition, in the past and continuing to the present, the DOD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. See *Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

32.     With respect to the second requirement, 3M's products have appeared on the DOD

Qualified Products Listing,[12] which could have happened only if Naval Sea Systems Command

had first determined that the products conformed to the MilSpec.[13] *See Ayo*, 2018 WL 4781145, at

*13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock

product and that the government approved reasonably precise specifications requiring them to use

PFCs, including PFOS and PFOA, in their products. . . . There is also colorable evidence . . . that

Manufacturing Defendants' AFFF products conformed to the government's reasonably precise

specifications."); *AFFF I*, 2019 WL 2807266, at *3 (finding that defendant demonstrated a

colorable defense "where it contends that its AFFF products were manufactured according to the

U.S. military's MilSpec specifications").

33.     Regarding the third requirement, the government was sufficiently informed

regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary

authority in specifying and procuring MilSpec AFFF. The military specifications have long

included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.

[14] Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may

contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the

soil and potentially reach groundwater; and that it has been reported that this may raise

environmental or human health issues.[15] For example, as early as October 1980, a report supported

---

[12] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

[13] *See* DOD SD-6, supra note 7, at 1.

[14] See, e.g., MIL-F-24385 §§ 3.16 & 4.7.16 (Rev. May 2, 1977).

[15] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid, and Its Salts* 1–6 (Nov. 4, 2002) (excerpt).

by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[16] In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[17] By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent." In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer. More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[18] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[19] *See Ayo*, 2018

---

[16] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[17] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[18] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[19] *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, at 5 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . ").

34.     At a minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See Twinam v. Dow Chem. Co.* (*In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *Twinam*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

35.     3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries that were caused in whole or in part by 3M's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

36.     In the MDL, the court has found based on an extensive factual record that the government contractor defense asserted by 3M and other defendants presents genuine issues of

fact for trial. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues is by definition better than merely "colorable."

37.     Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

## IN THE ALTERNATIVE, REMOVAL IS PROPER UNDER CAFA

38.     CAFA provides a separate and independent ground for removal of this action. CAFA "provides the federal district courts with 'original jurisdiction' to hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000.'" *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013) (citing 28 U.S.C. § 1332(d)(2), (d)(5)(B)). To determine whether the amount in controversy requirement under CAFA is satisfied, "the claims of the individual class members shall be aggregated." *Id.* (quoting § 1332(d)(6)). Moreover, under CAFA, this action "may be removed to a district court of the United States in accordance with section 1446 . . . without regard to whether any defendant is a citizen of the State in which the action is brought." 28 U.S.C. § 1453(b).

A.     **The Numerosity Requirement Is Satisfied**

39.     Plaintiff Steketee seeks to represent other persons on a class action basis as alleged in the Complaint. (*See*, *e.g.*, Ex. A, Compl. ¶¶ 259-61.) Accordingly, this case is a "class action" within the meaning of CAFA because it is brought pursuant to a "State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).

40.     The numerosity requirement is easily satisfied. Plaintiff Steketee seeks to represent a putative class composed of "[a]ll persons who own residential properties in the geographic area

defined as La Cienguilla and La Cienega communities south of Santa Fe, New Mexico." (Ex. A., Compl., ¶ 261; *see also id.*, App'x A (describing the "Class Geographic Area").) The Complaint expressly alleges that "[t]he population in the Class Geographic Area is estimated to include approximately 590 properties utilizing groundwater wells, with sometimes multiple occupants" and that Plaintiff Steketee "believes that there are hundreds of members of the Plaintiff Class who own and/or occupy properties [that] have been impacted by PFAS from Defendants' AFFF as described herein." (*Id.* ¶ 264.)

### B.   The Minimal Diversity Requirement Is Satisfied

41.     The minimal diversity requirement is met if "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

42.     As the Complaint alleges, Defendant 3M is a Delaware corporation with its principal place of business in Minnesota. (Ex. A., Compl.. ¶ 15.) Thus, 3M is a citizen of Delaware and Minnesota, and the minimal diversity requirement is satisfied here if any single member of the putative class is a citizen of a state other than Minnesota and Delaware. The Complaint alleges that Plaintiff Steketee is an owner and occupant of real property located in New Mexico and has owned the property since 1998 (*id.* ¶ 14), and that "Plaintiff and Class Members are citizens of Santa Fe County, New Mexico" (*id.* ¶ 120). Thus, on the face of the Complaint, the minimal diversity requirement is satisfied.

### C.   The Amount in Controversy Requirement Is Satisfied

43.     Under CAFA, the amount in controversy must exceed five million dollars ($5,000,000), exclusive of interest and costs. See 28 U.S.C. § 1332(d)(2). In a putative class action, the amount in controversy is determined by aggregating the claims of all members of the putative class. *See* 28 U.S.C. § 1332(d)(6). The Supreme Court has made clear that "a defendant's notice

of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold." *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014); *see also, e.g.*, *Arias v. Residence Inn by Marriott*, 936 F.3d 920, 924-25 (9th Cir. 2019); 28 U.S.C. § 1446(c)(2) ("the notice of removal may assert the amount in controversy"). The Court may also consider claims for punitive damages and attorneys' fees as part of the jurisdictional amount. *See Porter v. MetroPCS Comm'ns*, 592 F. App'x 780, 782-83 (11th Cir. 2014); *see also Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001) (punitive damages); *Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1156 (9th Cir. 1998) (attorneys' fees).

44.     Given the potential number of putative class members and the relief sought, it is apparent that the aggregate amount in controversy in this action exceeds five million dollars ($5,000,000), exclusive of interest and costs. The Complaint seeks, *inter alia*, "compensation for decrease in the value and marketability of the property and property rights of Plaintiff owners and the Class Member owners"; "the and cost of remediation of class properties and/or mitigation systems for those properties, and the costs incurred for alternative water"; and "compensation for the loss of use, loss of use and enjoyment of their properties, and their annoyance, discomfort, and inconvenience" (Ex. A., Compl., ¶ 345) on behalf of the allegedly "hundreds of members of the [putative] Plaintiff Class who own and/or occupy properties [that] have been impacted by PFAS from Defendants' AFFF" (*id.*, ¶ 264). The Complaint also seeks "disgorgement of the profits and savings" allegedly "obtained by the unjust enrichment of Defendants through their use of and at the expense of the properties of Plaintiff and the Class Members", as well as "exemplary damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future," and attorneys' fees. (*Id.*, ¶ 346; *see also id.*, pp. 64-65 ("Prayer For Relief").)

45.     Accordingly, although 3M denies that Plaintiff Steketee or any putative class members are entitled to recover any amount, and denies that Plaintiff Steketee or putative class members are entitled to any of the relief sought, the amount in controversy requirement for removal under CAFA is satisfied.

46.     Because the numerosity, minimal diversity, and amount in controversy requirements of CAFA are satisfied, this case is subject to removal to federal court under CAFA.

WHEREFORE, 3M hereby removes this action from the County of Sante Fe, First Judicial District Court, to this Court.

RESPECTFULLY SUBMITTED this 23rd day of May, 2024.

Respectfully submitted,

BOWMAN AND BROOKE LLP

/s/ Curtis J. Busby
Curtis J. Busby (#149815)
Amanda E. Heitz (#153070)
2929 North Central Avenue, Suite 1900
Phoenix, Arizona 85012
Tel: (602) 643-2300
Fax: (602) 248-0947
Curtis.Busby@bowmanandbrooke.com
Amanda.Heitz@bowmanandbrooke.com

**Counsel for 3M Company**

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2024, a copy of the foregoing was electronically filed with

the Clerk of the Court using the CM/ECF system, which will send electronic notice of such filing

to all counsel of record, and that a copy was served via U.S. Mail to the following:

Brian S. Colon
Damon J. Hudson
SINGLETON SCHREIBER LLP
6501 Americas Parkway NE, Suite 670
Albuquerque, NM 87110

Kevin S. Hannon
1641 Downing Street
Denver, CO 80218

AGC CHEMICALS AMERICAS INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

AMEREX CORPORATION
c/o James M. Proctor II
2900 Highway 280
Suite 300
Birmingham, AL 35223

ARCHROMA U.S. INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

ARKEMA INC.
900 First Avenue
King of Prussia, PA 19406

BASF CORPORATION
100 Park Avenue
Florham Park, New Jersey 07932

BUCKEYE FIRE EQUIPMENT COMPANY
c/o/ A Haon Corporate Agent, Inc.
29225 Chagrin Blvd, Suite 350
Pepper Pike, OH 44122

CARRIER GLOBAL CORPORATION
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

CHEMDESIGN PRODUCTS, INC.
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, New Castle, DE 19808

CHEMGUARD, INC.
c/o The Prentice-Hall Corporation System, Inc.
251 Little Falls Drive
Wilmington, New Castle, DE 19808

CHEMICALS, INC.
c/o Ashok K. Moza
12321 Hatcherville
Baytown, TX 77520

CLARIANT CORPORATION
c/o Corporation Service Company
8040 Excelsior Drive, Suite 400
Madison, WI 53717

CORTEVA, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DEEPWATER CHEMICALS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DUPONT DE NEMOURS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

DYNAX CORPORATION
c/o Corporate Systems LLC
3500 S. Dupont Highway
Dover, DE 19901

E.I. DU PONT DE NEMOURS AND COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

JOHNSON CONTROLS, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

KIDDE PLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

NATION FORD CHEMICAL COMPANY
c/o John A. Dickson, IV
2300 Bank Street
Fort Mill, SC 29715

NATIONAL FOAM, INC.
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

THE CHEMOURS COMPANY FC, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

TYCO FIRE PRODUCTS LP
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

UTC FIRE & SECURITY AMERICAS CORPORATION, INC.
c/o Registered Office
15720 Brixham Hill Ave #300
Charlotte, NC 28277

DAIKIN AMERICA, INC.
20 Olympic Drive
Orangeburg, NY 10962

KINGSWAY INDUSTRIES, INC.
2066 Alexander Avenue
Anderson, VA 96007

/s/ Curtis J. Busby
Curtis J. Busby

# EXHIBIT A

## SUMMONS

| District Court: First Judicial District<br>Santa Fe County, New Mexico Court<br>Address:  P.O. Box 2268<br>Santa Fe, NM  87504-2268<br>Telephone:  (505) 855-8160 | Case Number: D-101-CV-2024-00569<br><br>Judge: Honorable Maria Sanchez-Gagne |
| --- | --- |
| Plaintiffs:  JENNIFER STEKETEE,<br>v.<br>Defendants: THE 3M COMPANY, (f/k/a<br>Minnesota Mining and Manufacturing Co.), et al. | Defendant Name:<br>CLARIANT CORPORATION<br>4000 Monroe Road<br>Charlotte, North Carolina 28205 |

### TO THE ABOVE-NAMED DEFENDANT(S): Take notice that:

      1.     A lawsuit has been filed against you. A copy of the Class Action Complaint for Property Related Damages and Demand for Jury Trial and Plaintiffs' 6-Person Jury Demand are attached. The Court issued this Summons.

      2.     You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Court's address is listed above.

      3.     You must file (in person or by mail) your written response with the Court.  When you file your response, you must give or mail a copy to the person who signed the lawsuit.

      4.     If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

      5.     You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

      6.     If you need an interpreter, you must ask for one in writing.

      7.     You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6227; or 1-505-797-6066.

Santa Fe                                           12

Kathleen Vigil Dated at _____, New Mexico, this \_\_\_\_ day of March, 2024.

CLERK OF COURT

By: _____
    Deputy

*/s/ Brian S. Colón*
SINGLETON SCHREIBER, LLP
Brian S. Colón
Damon J. Hudson
6501 Americas Parkway NE, Suite 670
Albuquerque, NM 87110
(505) 437-5066
bcolon@singletonschreiber.com
dhudson@singletonschreiber.com
*Counsel for the Plaintiff and Plaintiff Class*

/s/ Kevin S. Hannon
Kevin S. Hannon
1641 Downing Street
Denver, CO 80218
(303) 861-8800
khannon@singletonschreiber.com
*Admission Pro Hac Vice to Be Submitted*

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 NMRA OF THE NEW MEXICO
RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.

## RETURN[1]

STATE OF NEW MEXICO          )
                            )ss
COUNTY OF _____       )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to
this lawsuit, and that I served this summons in _____ county on the _____ day of
_____, _____, by delivering a copy of this summons, with a copy of complaint
attached, in the following manner:

***(check one box and fill in appropriate blanks)***

[ ]     to the defendant _____ (*used when defendant accepts a copy of
summons and complaint or refuses to accept the summons and complaint*)

[ ]     to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA (*used when
service is by mail or commercial courier service*).

After attempting to serve the summons and complaint on the defendant by personal service or by
mail or commercial courier service, by delivering a copy of this summons, with a copy of
complaint attached, in the following manner:

[ ]     to _____, a person over fifteen (15) years of age and residing at
the usual place of abode of defendant _____, (*used when the defendant is not
presently at place of abode*) and by mailing by first class mail to the defendant at
_____ (*insert defendant's last known mailing address*) a copy of the summons and
complaint.

[ ]     to _____, the person apparently in charge at the actual place of
business or employment of the defendant and by mailing by first class mail to the defendant at
_____ (*insert defendant's business address*) and by mailing the summons and
complaint by first class mail to the defendant at _____ (*insert defendant's last
known mailing address*).

[ ]     to _____, an agent authorized to receive service of process for
defendant _____.

[ ]    to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*).

[ ]    to _____ (*name of person*), _____, (*title of person authorized to receive service. Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees: _____

_____
Signature of person making service

_____
Title (*if any*)

Subscribed and sworn to before me this _____ day of _____, _____.[2]

_____
Judge, notary or other officer
authorized to administer oaths

_____
Official title

USE NOTE

1.    Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

2.    If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013; as amended by Supreme Court Order No. 13-8300-022, effective for all cases pending or filed on or after December 31, 2013; as amended by Supreme Court Order No. 14-8300-017, effective for all cases pending or filed on or after December 31, 2014.]

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
3/6/2024 3:33 PM
KATHLEEN VIGIL CLERK OF THE COURT
Mayra Mendoza-Gutierrez

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICAL DISTRICT COURT

JENNIFER STEKETEE;
for herself and on behalf
of all others similarly situated,

Plaintiffs,

Case assigned to Sanchez-Gagne, Maria

v.

Case No.      D-101-CV-2024-00569

THE 3M COMPANY (f/k/a Minnesota Mining and
Manufacturing Co.); TYCO FIRE PRODUCTS, L.P.,
successor-in-interest to The Ansul Company;
JOHNSON CONTROLS INTERNATIONAL, PLC;
CHEMGUARD, INC.; BUCKEYE FIRE
EQUIPMENT COMPANY; E.I. DUPONT DE
NEMOURS AND COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise; THE CHEMOURS COMPANY,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise; THE CHEMOURS
COMPANY FC, LLC, individually and as successor
in interest to DuPont Chemical Solutions Enterprise;
CORTEVA, INC.; DUPONT DE NEMOURS INC.,
f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC
CHEMICALS AMERICAS INC.;
DYNAX CORPORATION; CLARIANT
CORPORATION; BASF CORPORATION;
CHEMDESIGN PRODUCTS, INC.; AMEREX
CORPORATION; ARCHROMA MANAGEMENT
LLC; DEEPWATER CHEMICALS, INC.; NATION
FORD CHEMICAL COMPANY; CHEMICALS,
INC.; and KINGSWAY INDUSTRIES, INC.
(f/k/a Tri-Max KCAF Fire Technologies)

Defendants.

---

## CLASS ACTION COMPLAINT FOR PROPERTY RELATED DAMAGES
## AND DEMAND FOR JURY TRIAL

---

Plaintiff JENNIFER STEKETEE, (collectively, "Plaintiffs") for herself individually and on behalf

of all others similarly situated, by and through their attorneys, file this action against THE 3M

COMPANY (f/k/a Minnesota Mining and Manufacturing Co.) ("3M");  TYCO FIRE

PRODUCTS, L.P., successor-in-interest to THE ANSUL COMPANY ("TYCO"); JOHNSON

CONTROLS INTERNATIONAL, PLC, successor-in-interest to TYCO FIRE PRODUCTS, L.P.

("JOHNSON CONTROLS"); CHEMGUARD, INC.; NATIONAL FOAM, INC.; BUCKEYE

FIRE  EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY,

individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE

CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical

Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individual and as successor in

interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS

INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.;

DYNAX CORPORATION; CLARIANT CORPORATION; BASF CORPORATION;

CHEMDESIGN PRODUCTS, INC.; AMEREX  CORPORATION;  ARCHROMA

MANAGEMENT LLC; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL

COMPANY; CHEMICALS, INC.; and KINGSWAY INDUSTRIES, INC. (f/k/a Tri-Max

KCAF Fire Technologies) (collectively referred to herein as the "Defendants"), and allege as

follows:

## SUMMARY OF CLAIMS

1.      Plaintiff Jennifer Steketee and Class Members are residential real property owners

in the La Cieneguilla and La Cienega communities in Santa Fe County, New Mexico, where the

aquifer suppling water to private household wells has been contaminated by the presence of

chemicals manufactured, distributed, and/or sold by the Defendants.

2.      Plaintiff and Class Members seek to be made whole for their property related harms

and losses because their water supplies and residential real property have been contaminated by toxic per- and polyfluoroalkyl substances ("PFAS") components of aqueous film forming foam ("AFFF") manufactured, sold, and/or distributed by Defendants with knowledge of and with inadequate warnings of the toxic effects PFAS would cause if they entered and contaminated the environment. Defendants' conduct was without regard to Plaintiff and Class Members whose property and property rights would foreseeably be invaded by toxic PFAS components in AFFF once they infiltrated the environment, including groundwater and private wells.

3.     For decades the Defendants manufactured and sold AFFF, a firefighting suppressant, to the United States Army ("Army"), including New Mexico Army National Guard, Santa Fe Army Aviation Support Facility ("Santa Fe AASF"), as well as airports such as the Sanat Fe Regional Airport ("SFR Airport"), and fire departments such as the City of Santa Fe Fire Department in Santa Fe County, New Mexico.

4.     Properties in the Class Geographic Area (Class Area), located south of the SFR Airport and Santa Fe AASF, have obtained and continue to obtain their household water supplies from groundwater pumped by private household wells accessing an aquifer contaminated with toxic PFAS components from Defendants' AFFF. Plaintiff's and Class Members' water supply, water systems, piping, soil, vegetation, and other property are contaminated by AFFF, and its toxic PFAS components, including perfluorooctane sulfonate ("PFOS"), perfluorooctanoic acid ("PFOA"), perfluoroheptanoic acid ("PFHpA"), and other species of PFAS manufactured, sold, and/or distributed by Defendants. When consumed, the toxic PFAS components in AFFF can cause numerous serious health impacts. The presence of toxic PFAS components from AFFF contaminates household water in residential homes and interferes with property rights. PFAS

2

contamination has occurred in the past, is ongoing, and will continue well into the future.

5.     Defendants manufactured AFFF and/or its toxic PFAS components, including fluorochemical surfactants, PFOS, PFOA, and/or certain other PFAS that degrade into PFOS or PFOA. As the manufacturers of AFFF, the Defendants knew since at least the 1960s and 1970s that the inclusion of PFAS in AFFF presented an unreasonable risk to human health and the environment. Defendants also knew or should have known that PFAS are highly soluble in water, and highly mobile and highly persistent in the environment, and highly likely to contaminate residential real property water supplies and soil if released to the environment.

6.     Nonetheless, Defendants marketed and sold their products with knowledge that large quantities of toxic AFFF would be stored, used in training exercises, in fire control, in fire sprinkler systems, in emergency situations, and in other ways at Army National Guard (ANG) facilities, airports, and by fire departments and emergency responders in such a manner that dangerous chemicals would be released into the environment. Defendants knew or should have known that even when used as intended by the products' design, discharge of toxic PFAS components into the environment was certain to cause environmental and health hazards.

7.     Plaintiff and Class Members household water supplies have been contaminated for years, if not decades, to PFAS including at concentrations hazardous to human health. Residents had no way to know that they were consuming water contaminated with PFAS until the contamination was disclosed to them.

8.     Residential real properties in the Class Area have been contaminated with toxic PFAS components.

9.     For decades, SFR Airport and Santa Fe AASF, stored and used AFFF products as

3

intended in fire suppression, annual testing, and for other purposes. As a result, toxic PFAS components that Defendants used in their AFFF migrated into the groundwater surrounding SFR Airport and Santa Fe AASF and contaminated private wells used to provide household water supplies to properties in the Class Area.

10. Sampling and testing from private household wells in the Class Area have detected toxic PFAS components from AFFF used at SFR Airport and Santa Fe AASF.

11. Plaintiff and the Class Members seek compensation for: decrease in value and marketability of their property and property rights which PFAS contamination has diminished and will continue to diminish; the need for and cost of remediation of Plaintiff's and Class Members' properties and/or mitigation systems for those properties; cost incurred for alternative water supplies; the loss of use of their properties; loss of enjoyment of their properties; and their annoyance, discomfort, and inconvenience caused by the contamination of their properties by Defendants' AFFF and toxic PFAS components.

12. The Plaintiff bring this suit on behalf of herself and all those similarly situated to recover for property related harms and losses related to the interference with property rights caused by Defendants' manufacturing, sale, and/or distribution of AFFF and toxic PFAS components.

## PARTIES

13. Plaintiffs are individuals, all of whom, at all relevant times to the action, owned and/or used private drinking wells within the Class Area, and were exposed to and ingested toxic PFAS components for at least one year over the past five decades from SFR Airport and Santa Fe AASF's use of Defendants AFFF.

14. Plaintiff Jennifer Steketee is an owner and occupant of real property using a private

4

household well, located at 68 Camino Torcido Loop, Santa Fe, New Mexico 87507. She has owned the property since 1998 and has consumed and used water from her well for household purposes.

15.     Defendant 3M is a corporation organized under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133. Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS to airports and ANG facilities, including SFR Airport and Santa Fe AASF.

16.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

17.     Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

18.     In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

19.     On information and belief, beginning in 2011, Amerex designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, including but not limited to PFOA and PFOS.

20.     Defendant Tyco Fire Products LP ("Tyco") is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

21.     Tyco manufactures the Ansul brand of products and is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

22.     Beginning in or around 1975, Ansul designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, including but not limited to PFOA and PFOS.

23.     After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, sell, and/or distribute AFFF products containing PFAS, including but not limited to PFOA and PFOS.

24.     Defendant, Johnson Controls is a corporation organized and existing under the laws of Ireland, having a principal place of business at 5757 N. Green Bay Ave., Milwaukee, WI 53209. On or about September 2, 2016, Johnson Controls merged with a subsidiary of Tyco's parent company, Tyco International plc, named Jagara Merger Sub LLC. Johnson Controls was the surviving corporation. After the merger, Tyco International plc changes its name to Johnson Controls International plc.

25.     Tyco is an indirect subsidiary wholly owned by Johnson Controls. Since on or around September 2, 2016, Tyco and Johnson Controls have maintained service agreements under which Johnso Controls provides certain services, including environmental consulting and management, to Tyco. Since that time, Johnson Controls has authorized, supervised, directed, performed, or failed to perform the acts alleged in this Complaint.

26.     Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

27.     Chemguard is an indirect subsidiary wholly owned by Johnson Controls, acquired by Tyco in 2011.

28.     On information and belief, Chemguard designed, manufactured, marketed, sold, and/or distributed AFFF products containing PFAS, including but not limited to PFOA and PFOS.

29.     On information and belief, Chemguard was acquired by Tyco International Ltd.

In 2011.

30.      On information and belief, 3M and Chemguard also designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

31.      Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

32.      On information and belief, Buckeye designed, manufactured, marketed, sold, and/or distributed AFFF products containing PFAS, including but not limited to PFOA and PFOS.

33.      National Foam, Inc. ("National Foam") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

34.      Beginning in or around 1973, National Foam designed, manufactured, marketed, sold, and/or distributed AFFF containing PFAS, including but not limited to PFOA and PFOS.

35.      On information and belief, National Foam currently manufactures the Angus brand of AFFF products and is a subsidiary of Angus International Safety Group.

36.      On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

37.      At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF containing PFAS that was used for training and to fight fires at airports and ANG facilities, throughout the United States, including SFR Airport and Santa Fe AASF.

38.      On information and belief, Chubb is or has been composed of different

7

subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

39.     On information and belief, Chubb was acquired by William Holdings in 1997.

40.     On information and belief, Angus Fire Annour Corporation had previously been acquired by Williams Holdings in 1994.

41.     On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

42.     On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

43.     On information and belief, Angus Fire Armour Corporation and National Foam separated from United Technologies Corporation in or around 2013.

44.     Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc. ("Kidde"), is a Massachusetts corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant to the present litigation, Kidde designed, manufactured, and sold AFFF containing PFAS that was used in training operations and for emergency fire-fighting situations, including at SFR Airport and Santa Fe AASF.

45.     Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Financial Plaza, Hartford, Connecticut 06101.

46.     On information and belief, Kidde-Fenwal was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies

Corporation.

47.     On information and belief, Kidde-Fenwal is the entity that divested the AFFF business unit now operated by National Foam in 2013.

48.     Kidde-Fenwal is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant to this litigation, Kidde-Fenwal designed, manufactured, sold, and/or distributed AFFF used in training operations and for emergency fire-fighting situations, including at SFR Airport and Santa Fe AASF.

49.     Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to Kidde-Fenwal.

50.     Upon information and belief, the Canadian Intellectual Property Office has registered the National Foam trademark to Kidde-Fenwal, Inc., formerly registered to Kidde Fire Fighting, Inc.

51.     UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc. ("UTC Fire"), is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. At all times relevant to this litigation, UTC Fire designed, sold, and/or distributed AFFF used for training operations and fighting fires, including at SFR Airport and Santa Fe AASF.

52.     Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

53.     Enterra Corporation ("Enterra") is a Massachusetts corporation. At all times relevant, Enterra designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous airports and ANG facilities, , including at SFR Airport and Santa Fe AASF.

9

54.     Upon information and belief, Enterra is the current holder of the National Foam trademark.

55.     Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

56.     On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde- Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde- Fenwal's design, manufacture, marketing, sale, and distribution of AFFF.

57.     National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., individually and as successor in interest to National Foam, Inc.; Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; Kidde-Fenwal, Inc., individually and as successor in interest to National Foam, Inc.; UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc.; Enterra Corporation;  and Carrier Global Corporation, individually and as successor in interest to National Foam, Inc. are collectively referred to herein as "National Foam."

58.     At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at SFR Airport and Santa Fe AASF.

59.     Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

60. Arkema develops specialty chemicals and polymers.

61. Arkema is an operating subsidiary of Arkema France, S.A.

62. Arkema is a successor in interest to Elf Atochem North America ("Elf Atochem") and Atofina Chemicals Inc ("Atofina").

63. On information and belief, Arkema designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

64. Defendant BASF Corporation ("BASF") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

65. On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

66. On information and belief, BASF Corporation is the successor in interest to Ciba- Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc. ("Ciba-Geigy"), Swiss specialty chemicals companies.

67. Ciba-Geigy manufactured and sold PFAS or PFAS components for use in AFFF, including at SFR Airport and Santa Fe AASF.

68. Defendant ChemDesign Products Inc. ("ChemDesign") is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, WI, 54143.

69. On information and belief, ChemDesign designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

11

70.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

71.     On information and belief, Deepwater Chemicals designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

72.     Defendant Dynax Corporation ("Dynax") is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

73.     On information and belief, Dynax entered the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

74.     On information and belief, Dynax designed, manufactured, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

75.     DuPont Chemical Solutions Enterprise ("DuPont Chemical") was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19898.

76.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

77.     In a letter addressed to the Office of Pollution Prevention and Toxics ("OPPT") Document Control Office, dated May 14, 2003, and signed by Stephen H.

12

Korzeniowski, DuPont provided its list of telomer-based sales products in the United States for the year 2002.

78.     The letter, which was redacted and sent to the United States Environmental Protection Agency ("EPA") under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service ("CAS") number and chemical name, and is included in the PFOA Stewardship Program Docket. [1]

79.     At all times relevant to the present litigation, DuPont Chemical designed, manufactured and sold AFFF used for training and to fight fires at numerous locations including airports and ANG facilities, across the United States.

80.     Defendant, E.I. Du Pont de Nemours and Company ("E.I. DuPont"), successor in interest to DuPont Chemical, is a Delaware Corporation and does business throughout the United States, including conducting business in New Mexico. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

81.     At all times relevant to the present litigation, E.I. DuPont designed, manufactured and sold AFFF used for training and to fight fires at numerous airports and other locations throughout the country, including SFR Airport and Santa Fe AASF.

82.     Defendant The Chemours Company ("Chemours"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in New Mexico. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19889.

83.     Chemours was incorporated as a subsidiary of E.I. Du Pont as of April 30,

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621, last accessed 9.22.20.

2015. From that time until July 2015, Chemours was a wholly owned subsidiary of E.I. Du Pont. In July 2015, E.I. Du Pont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which included the fluoroproducts business, distributing shares of Chemours stock to E.I. Du Pont stockholders, and Chemours has since been an independent, publicly traded company.

84.     Upon information and belief, at all times relevant to the present litigation, Chemours designed, manufactured, and sold AFFF used for training and to fight fires at numerous airports and ANG facilities, and other locations throughout the country, including SFR Airport and Santa Fe AASF.

85.     E.I. Du Pont merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. ("DowDuPont"). E.I. Du Pont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has affected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

86.     Defendant The Chemours Company FC L.L.C. ("Chemours Company"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in New Mexico. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

87.     Upon information and belief, at all times relevant to the present litigation, Chemours Company designed, manufactured and sold AFFF used for training and to fight fires at numerous airports and ANG facilities, and other locations throughout the country, including SFR Airport and Santa Fe AASF.

88.     Defendant DuPont de Nemours Inc. ("DuPont"), f/k/a DowDuPont, is a Delaware Corporation that conducts business throughout the United States, including business in New Mexico. Its principal place of business is 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

89.     Upon information and belief, at all times relevant to the present litigation, DuPont de Nemours manufactured, designed and sold AFFF and/or PFAS constituents in AFFF that was used at SFR Airport and Santa Fe AASF.

90.     Defendant Corteva, Inc. ("Corteva") is a Delaware Corporation that conducts business throughout the United States, including business in New Mexico. Its principal place of business is 974 Centre Rd., Wilmington, Delaware 19805.

91.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

92.     Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

93.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of DuPont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

94.     At all times relevant to the present litigation, Corteva designed, manufactured and sold AFFF and/or PFAS constituents in AFFF that was used at SFR Airport and Santa Fe AASF.

95.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of

15

Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva, Inc.

96.     Defendants E. I. DuPont; Chemours; Chemours Company; Corteva; and New DuPont are collectively referred to as "DuPont" throughout this Complaint.

97.     On information and belief, DuPont designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

98.     Defendant AGC Chemicals Americas, Inc. ("AGC Americas") is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, PA 19341.

99.     On information and belief, AGC Americas was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405, Japan.

100.    AGC Americas manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

101.    On information and belief, AGC Americas designed, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

102.    Defendant Archroma Management, LLC ("Archroma") is a foreign

16

corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

103. On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

104. On information and belief, Archroma designed, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

105. Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

106. On information and belief, Chemicals, Inc. supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

107. Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

108. Upon information and belief, Clariant was formerly known as Sandoz Chemicals Corporation ("Sandoz") and as Sodyeco, Inc ("Sodyeco").

109. On information and belief, Clariant is the successor in interest to the specialty chemical business of Sandoz. On information and belief, Sandoz spun off its specialty chemical business to form Clariant in 1995.

110. Clariant, Sandoz, and/or Sodyeco manufactured and sold PFAS or PFAS

constituents for use in AFFF, including at SFR AIRPORT AND SANTA FE AASF.

111.    On information and belief, Clariant supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

112.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

113.    Upon information and belief, Nation Ford supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

114.    Defendant Kingsway Industries, Inc. (f/k/a Tri-Max™ KCAF Fire Technologies is a corporation organized and existing under the laws of California, with its principal place of business located at 2066 Alexander Avenue, Anerson, California 96007.

115.    Upon information and belief, Kingsway Industries Inc. manufactured, distributed, and/or sold fire suppression systems, including the Tri-Max™ Hand Truck 70/30 that contained AFFF to Santa Fe AASF.

116.    Upon information and belief, 3M, ChemDesign, Deepwater Chemicals, and DuPont also supplied PFAS containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

117.    Upon information and belief, the Defendants supplied, manufactured, marketed, sold, and/or distributed PFAS containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed at SFR Airport and Santa Fe

18

AASF.

118.     All Defendants, at all times material herein, acted by and through their respective agents, servants, officers, and employees, actual or ostensible, who were acting within the course and scope of their actual or apparent agency, authority or duties, Defendants are liable based on such activities, directly and vicariously.

119.     Defendants represent all or substantially all the market for AFFF and its toxic PFAS components used and released at SFR Airport and Santa Fe AASF.

**JURISDICTION AND VENUE**

120.     Jurisdiction is proper in this Court pursuant to NMSA 1978, § 38-3-1 because the Plaintiff and Class Members are citizens of Santa Fe County, New Mexico. This Court has personal and subject matter jurisdiction over the parties and the subject matter.

121.     Venue is proper in this Court pursuant to NMSA 1978, § 38-3-1(A)(E) because the events or omissions by Defendants giving rise to the claims asserted herein occurred in Santa Fe County, have caused harm to Plaintiff and Class Members residing in and to real property in Santa Fe County.

**GENERAL FACTUAL ALLEGATIONS**

122.     PFAS are manmade chemicals that do not exist in nature. There are numerous chemicals in the PFAS family, including PFOS and PFOA. Defendants manufactured and used PFAS to make AFFF. Defendants distributed and/or sold AFFF containing toxic PFAS.

123.     PFAS are persistent in the environment. Due to the strength of multiple carbon-fluorine bonds, PFAS break down very slowly in the environment. PFAS are

chemically and biologically stable and resistant to environmental degradation. PFAS can persist in the environment for decades. PFAS are also water soluble, making them mobile in groundwater and the environment.

124.     Toxicology studies show that PFAS are readily absorbed after oral exposure and accumulate in the human body.

125.     There are a number of health risks associated with exposure to PFAS. For example, PFOS and PFOA exposure is associated with increased risk in humans of testicular cancer and kidney cancer, disorders such as thyroid disease, high cholesterol, ulcerative colitis, and pregnancy-induced hypertension, as well as other conditions.[2] EPA has also advised that exposure to PFAS may result in developmental effects to fetuses during pregnancy or to breast-fed infants. Id.

126.     Defendants each manufactured, sold, and/or distributed AFFF, and its toxic PFAS components, to airports, fire departments, and ANG facilities across the United States, including to SFR Airport and Santa Fe AASF.

127.     The military Qualified Products Database listed 3M AFFF products as early as 1970, National Foam products by 1973, and Ansul products as early as 1976.[3]

128.     According to a 2011 Department of Defense ("DoD") risk alert document, "through 2001, the DoD purchased AFFF from 3M and/or Ansul, Inc. 3M supplied PFOS-based AFFF under the product name, 3M Light Water AFFF."[4]

129.     At any given time during its operation, Santa Fe AASF housed and used

---

[2] https://www.epa.gov/sites/production/files/2016-05/documents/drinkingwaterhealthadvisories_pfoa_pfos_5_19_16.final_.1.pdf
[3] http://dcppe.org/Systems/AFFF/MIL-F-24385%20QPL%20History%20for%20Type%206%20AFFF.pdf
[4] DoD Risk Alert #03-11, "Aqueous Film Forming Foam",
http://www.denix.osd.mil/cmrmp/ecmr/ecprogrambasics/resources/chemical-material-emerging-risk-alert-for-afff/

AFFF concentrate manufactured by Defendants. The AFFF was expected to reach Santa Fe AASF without substantial change in the condition in which it was sold to the ANG, and it did.

130.    AFFF manufactured by Defendants was stored and available for use by ANG personnel to conduct training exercises at Santa Fe AASF including firefighting training for decades.

131.    AFFF manufactured by Defendants was used during emergency responses at SFR Airport.

132.    Upon information and belief, instructions and warning labels and material safety data sheets that were provided with the AFFF by the Defendants, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which they knew or should have known.

133.    Plaintiff and Class Members own residential real properties with private household wells within the Class Area.

134.    Toxic PFAS components from AFF released at the SFR Airport and Santa Fe AASF have migrated, and continue to migrate, through groundwater throughout the Class Area and have entered and contaminated Plaintiff's and Class Members' residential real property, water supplies, water systems, wells, piping, and other property.

135.    Concentrations of toxic PFAS components found in the private household wells providing the Plaintiff's and Class Members' water supplies have been caused by releases of Defendants' AFFF, and its toxic components on and around SFR Airport and Santa Fe AASF. As was reasonably foreseeable by Defendants AFFF, and its toxic PFAS components, migrated into and through the soil in and around SFR Airport and Santa Fe

AASF to groundwater. From there, Defendants' AFFF, and its toxic PFAS components, migrated to Plaintiff's and Class Members' private groundwater wells in the Class Area. The Class Area's PFAS contamination is directly and proximately linked to Defendants' manufacture, sale, and/or distribution of AFFF.

136.    Sampling and testing in the Class Area have detected toxic PFAS components from AFFF use at SFR Airport and Santa Fe AASF.

137.    Plaintiffs and Class Members seek compensation for: decrease in value and marketability of their property and property rights which PFAS contamination has diminished and will continue to diminish; the need for and the cost of remediation of Plaintiff's and Class Members' properties and/or mitigation systems for those properties; costs incurred for alternative water supplies; the loss of use of their properties; loss of enjoyment of their properties; and their annoyance, discomfort, and inconvenience caused by the contamination of their properties by Defendants' AFFF and toxic PFAS components.

138.    Plaintiff bring this suit on behalf of herself and all current and former residential real property owners in the Class Area to recover property related harms and losses related to the interference with property rights caused by Defendants' tortious conduct in the manufacture, sale, and/or distribution of AFFF and its toxic PFAS components.

## PFAS ARE USED IN AQUEOUS FILM FORMING FOAM

139.    PFAS are synthetic carbon chain compounds that are not naturally occurring and contain large amounts of the element fluorine. As used in this Complaint, the term "PFAS" includes all PFAS and their precursors, derivatives, and/or salts used in the AFFF released at SFR Airport and Santa Fe AASF which contaminated Plaintiff's and

22

Class Members' water supplies and property, including inter alia, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA.

140.    PFAS are used in firefighting foam known as "aqueous film forming foam" or "AFFF".

141.    AFFF is used to extinguish fires that involve petroleum or other flammable liquid because PFAS are resistant to heat, oil, grease, and water.

142.    3M AFFF is produced through a 3M process called electrochemical fluorination, or ECF, contained PFAS including PFOS. Tyco and other Defendants' AFFF are synthesized through telomerization and contain PFAS including PFOA. Both processes include formulations containing chemicals that can break down into other toxic PFAS components.

143.    Defendants each manufactured, sold, and/or distributed AFFF, and its toxic PFAS components, to airports, ANG facilities, and fire departments across the United States, including to SFR Airport and Santa Fe AASF.

144.    Defendants chose to include and/or distribute toxic PFAS components as ingredients in the AFFF sold and distributed to AFFF users, including SFR Airport and Santa Fe AASF, despite the availability of other technologically feasible, practical, and effective alternatives that would have reduced or mitigated Plaintiff's and Class Members' exposure to toxic PFAS.

145.    Defendants knew or should have known that the AFFF, and its toxic PFAS components, sold, and/or distributed to AFFF users, including SFR Airport and Santa Fe AASF, would be released into the environment and contaminate groundwater and

23

household water supplied, including Plaintiff's and Class Members' household water supplies.

146.    Defendants knew or should have known that their harmful and defective products, AFFF containing toxic PFAS components, would be used for various purposes at airports, ANG facilities and fire departments, including, but not limited to, training for emergency response, firefighting, testing firefighting equipment, and use in hangar sprinkler fire suppressant systems, which would cause the AFFF to drain into the ground and pollute or contaminate the groundwater beneath the airports and ANG facilities and eventually migrate into Plaintiff's and Class Members' private household water supplies.

### PFAS Including PFOA and PFOS Threaten Human Health

147.    PFAS are extremely persistent and bioaccumulate[5] in the human body. Even short-term exposure results in a body burden that persists for years and can increase and biomagnify[6] with continued exposure. When consumed PFAS accumulate primarily in the bloodstream, kidneys, and liver. Humans absorb toxic PFAS components from AFFF when they consume AFFF contaminated household water.

148.    The EPA projects that PFOS has a half-life of 5.3 years, PFOA has a half-life of 2.3-3.8 years, and PFHxS has a half-life of 8.5 years, in humans.[7] Because of these extended half-lives, the EPA expects that "it can reasonably be anticipated that continued exposure could increase body burden to level that would result in adverse outcomes."[8]

---

[5] Bioaccumulation is a process which occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism or excretion.

[6] Biomagnification is a process which occurs when concentration of a substance in organisms tissue increases as the substance travels up the food chain.

[7] A half-life is the amount of time it takes for fifty percent of a contaminant to leave the body.

[8] EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, pp. 1, 8-9, December 30, 2009.

149.     EPA Health Advisories have identified numerous health risks associated with exposure to toxic PFAS components. Studies show association between increased PFOA and PFOS levels in blood and increased risk of several adverse health effects, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

150.     The EPA classified PFOA and PFOS as having suggestive evidence of carcinogenic potential in humans.[9]

151.     The EPA cited reports from the Organization for Economic Co-operation and Development ("OECD") in the May 2016 Health Advisories. The OECD is an international intergovernmental organization that meets, discusses issues of concern, and works to respond to international problems.

152.     According to a published OECD Report, for mammalian species, PFOA and its salts have caused cancer in rats and adverse effects on the immune system in mice. In addition, PFOA and its salts can display reproductive or developmental toxicity in rodents at moderate levels of exposure, and moderate to high systemic toxicity in rodents and monkeys following long-term exposure by the oral route.[10] The OECD also concluded in a Hazard Assessment that PFOS is persistent, bioaccumulative, and toxic to mammalian species.[11]

153.     The EPA also cited findings from a C-8 Science Panel and Health Project in the May 2016 Health Advisory for PFOA. The C-8 Science Panel was formed out of a

---

[9] EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 3-159, May 2016; EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), p. 3-114, May 2016.
[10] OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007.
[11] OECD, Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts, p. 5, November 21, 2002

class action settlement related to PFOA contamination of groundwater from a manufacturing facility in West Virginia. The C-8 Health Project is the largest study evaluating human exposure and health endpoints for PFOA; the study included more than 65,000 people in Mid-Ohio Valley communities who were exposed to PFOA for longer than 1 year. The C-8 Science Panel consisted of three epidemiologists and its goal was to assess the links between PFOA and numerous diseases. The C-8 Science Panel carried out studies of exposure and health studies between 2005 and 2013; information was gathered through questionnaires and blood samples from the individuals who had PFOA contaminated drinking water and previously published studies.

154.    The C-8 Science Panel released reports which found probable links between exposure to PFOA and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular cancer, kidney cancer, and pregnancy-induced hypertension.

155.    The U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") stated in its 2018 draft Toxicological Profile that studies suggest associations between PFOA and PFOS exposure and liver damage, pregnancy-induced hypertension, increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk of decreased fertility, low birth weight, and increases in testicular and kidney cancers.

156.    Defendants knew or reasonably should have known about the environmental and health effects from toxic PFAS components, discussed above, at the time they developed, manufactured, marketed, sold, and/or distributed AFFF containing toxic PFAS components to airports, ANG facilities, and fire departments, around the United States, including SFR Airport and Santa Fe AASF.

**PFAS, Including PFOA and PFOS, Pose a Threat to the Private Household Wells Relied on by Plaintiff and Class Members**

157.     PFAS are extremely persistent in the environment because they are
chemically and biologically stable and are resistant to environmental degradation. The
EPA projects that PFOS has an environmental half-life in water of over 41 years, and
PFOA has an environmental half-life in water of over 92 years. PFOA and PFOS are also
considered to be resistant to degradation in soil. EPA, Long-Chain Perfluorinated
Chemicals (PFCs) Action Plan, p. 1, December 30, 2009.

158.     PFAS also are particularly mobile in soil and water, readily absorbed into
groundwater, and can migrate across long distances.

159.     Additionally, non-human receptors exposed to the contaminated
environment are at significant risk of harm. PFOA is persistent and can cause adverse
effects in laboratory animals, and humans, including cancer and developmental and
systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species.
PFOS is linked to developmental, reproductive, and systemic toxicity.

160.     PFOA is also readily absorbed by plants, including wild plants as well as
crops grown on contaminated soil and bioaccumulates in the food chain.

161.     These effects impair use of Plaintiff's and Class Members' household
water and other property throughout the Class Area.

162.     Upon information and belief, Defendants knew or should reasonably have
known about the environmental effects from toxic PFAS components, discussed above, at
the time they developed, manufactured, marketed, sold, and/or distributed AFFF, and its
toxic PFAS components.

**Defendants Knew of AFFF Toxicity and Failed to Provide Notice**

163.     Instructions, labels, and material safety data sheets ("MSDS") were

27

provided with AFFF and the toxic PFAS components used in AFFF sold by Defendants, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which Defendants knew or should have known.

164.     Defendants knew of these health and environmental hazards for years and, at least at significant times, failed to disclose this information to, and actively hid it from, their customers, including SFR Airport and Santa Fe AASF.

                (i)       1940s and 1950s: Early Warnings About the Persistence of AFFF

165.     In 1947, 3M created its fluorochemical program, and within four years, it began selling PFOA to DuPont. The persistence and contaminating nature of fluorosurfactants contained in AFFF products were understood prior to their commercial application.

166.     The inventor of 3M's ECF process, J.H. Simons', 1948 patent for the ECF process reported that fluorosurfactants produced by the process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that the stability of carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[12]

167.     3M knew as early as the mid-1950s that PFAS bio-accumulate in humans and animals.

168.     A 1956 study at Stanford University concluded that PFAS manufactured by 3M bind to proteins in blood.

---

[12] Simons, J.H., Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, 1950, available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

169.    Nowhere in any MSDS for any of Defendants' AFFF, or its toxic PFAS components, is information on the thermal stability of those products disclosed. Failure to disclose knowledge of the stability of the PFAS and fluorosurfactants used in AFFF products to customers is a failure to warn just how indestructible the AFFF's toxic PFAS ingredients are when released to unprotected water sources and even treatment plants.

(ii)    1960s: AFFF's Environmental Hazards Are Reinforced

170.    By the early 1960s, 3M understood that PFAS are stable, persist in the environment, and do not degrade.

171.    DuPont company scientists issued internal warnings about the toxicity associated with their PFOA as early as 1961.

172.    One 3M employee wrote in 1964: "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[13] Thus, 3M knew by the mid-1960s that its surfactants were immune to chemical and biological degradation in soil and groundwater.

173.    DuPont Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

174.    By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

(iii)    1970s: International Studies Provide Evidence of Environmental and

---

[13] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry, (1964), available at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

Health Risks

175.    In 1970, the authors of a scientific journal article observed after conducting tests on a 3M product containing PFAS that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

176.    Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

177.    An internal memorandum from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."14 Hence, 3M understood at the very least that the fluorosurfactant used in its AFFF products would, in essence, never degrade once released into the environment.

178.    By the mid-1970s, 3M and Ansul (and possibly other Defendants) had an intimate understanding of the persistent nature of PFAS. A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."15

179.    In 1977, Ansul authored a report titled "Environmentally Improved AFFF," which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality.16 Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic

---

14 Memorandum from H.G. Bryce to R.M. Adams re : Ecological Aspects of Fluorocarbons, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

15 Technical Report Summary, August 12, 1976 [3MA01252037].

16 Ansul Co., Final Report: Environmentally Improved AFFF, N00173-76-C-0295, Marinette, WI, Dec. 13, 1977, *available at* https://apps.dtic.mil/dtic/tr/fulltext/u2/a050508.pdf.

. . . improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness." Thus, Ansul knew by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Defendant) ever pursued such initiatives.

180.   A 1978 study by 3M on PFAS and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

181.   In 1978, based on information DuPont received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers to assess whether any negative health effects could be attributed to PFOA exposure. This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

182.   By 1979, DuPont's blood sample data indicated workers exposed to PFOA had significantly higher incidence of health issues than unexposed workers. DuPont did not report this data or the results of its workers' health analysis to any government agency or community.

183.   In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

184.   That same year, 3M and DuPont discussed 3M's discovery of PFOA in the blood of its workers and came to the same conclusion that there was "no reason" to notify

31

the EPA of its finding.17

185.    In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

186.    1980s and 1990s: Evidence of AFFF Health Risks Compound

187.    By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was not published, provided to government entities as required by law, or otherwise publicly disclosed.

188.    In 1980, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable." Not only did DuPont know PFOA accumulates in human tissue, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

189.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.18

190.    A subsequent rat study in 1982 which DuPont reported to the EPA showed PFOA crossing the placenta and presence in the maternal blood, DuPont concealed the

---

17 Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.
18 C-8 Blood Sampling Results, *available at* http://tiny.cc/v8z1mz.

results of these internal studies from its own plant workers.

191.   No later than 1984, DuPont was aware that PFOA is also biopersistent.

192.   DuPont had long been aware that PFAS it released, and was releasing, from its facilities were leaching into groundwater used for public drinking water.

193.   In 1984, after obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

194.   DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

195.   DuPont chose not to use either available technologies or replacement materials, despite full knowledge of PFOA's toxicity.

196.   During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

197.   They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

198.   In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo:

199.   [W]e must view this present trend with serious concern. It is certainly possible that ... exposure opportunities are providing a potential uptake of fluorochemicals

that exceeds excretion capabilities of the body."[19]

200.    A 1997 MSDS for a non-AFFF product made by 3M listed its only ingredients as water, PFOA, and other perfluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M and DuPont" as support for this statement. On information and belief, the MSDS for 3M's AFFF products did not provide similar warnings or information.

201.    By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M, DuPont, and Dynax Corporation, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver and pancreatic).

> (iv)    Defendants Hid a Known Toxic Chemical from the Government and the Public

202.    The potential loss of tremendous profits from PFAS drove 3M to engage in a deliberate campaign to influence the science related to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

203.    A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

204.    In exchange for providing grant money to friendly researchers, 3M

---

[19] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

obtained the right to review and edit the drafts of papers on PFAS and sought control over when or whether these papers were published at all.

205.    Under pressure from the EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier. 3M press release, "3M Phasing Out Some of Its Specialty Materials", May 16, 2000.

206.    3M, who was the predominant manufacturer of AFFF, ceased production of PFOS based AFFF in 2002.20

207.    An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree." EPA internal memo, "Phaseout of PFOS", May 16, 2000.[21]

208.    In contrast, 3M's news release insisted that "our products are safe" while extolling their "principles of responsible environmental management" as driving the cessation of production.[22]

209.    In 2001, the Firefighting Foam Coalition (hereinafter "FFFC"), an AFFF trade group, was formed to advocate for AFFF's continued viability on behalf of the Defendants. DuPont, which as described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC along with many other AFFF

---

[20] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1, last accessed 9.22.20.
[21] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0629.pdf#page=2n, last accessed 9.22.20.
[22] http://www.chemicalindustryarchive.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1, last accessed 9.22.20.

manufacturers, including Ansul, Buckeye, Chemguard, and Dynax.[23] Through their involvement in the FFFC, as well as a variety of other trade associations and groups, Defendants shared knowledge and information regarding PFOA. The Defendants worked together to protect AFFF from scrutiny including close cooperation included regarding messaging on PFOA's toxicological profile.

210.    The FFFC's efforts were designed to shield its members and the AFFF industry, including Defendants, from the detrimental impact of the public and regulators learning about the harms of PFAS to human health and the environment. Defendants regularly published newsletters and attended conferences bolstering their AFFF products. Coordinated efforts between FFFC and Defendants were meant to dispel concerns about the impact toxic PFAS components in their AFFF have on the environment and human health. The FFFC and Defendants worked in concert to conceal known risks of their AFFF, and its toxic PFAS components, from the government and public.

211.    DuPont's Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA. For example, in 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis for [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

212.    In the 1970s, Defendants began making AFFF with toxic PFAS components, including shorter carbon chain PFAS. Upon information and belief, those

---

[23] Fire Fighting Foam Coalition, Fact Sheet on AFFF Fire Fighting Agents, P62888 AFFF Fact Sheet (Page 1) (ewg.org) (listing founding members of the FFFC).

36

other toxic PFAS components also are highly soluble, persistent, bio-accumulative, and toxic to humans.

213.     AFFF, and its toxic PFAS components, were sold and/or distributed to airports, ANG facilities, and fire departments by Defendants. Thereafter, Defendants' AFFF was stored, used, released, discharged, and disposed of at SFR Airport and Santa Fe AASF, which has contaminated Plaintiff's and Class Members' household water supplies. For instance, toxic PFAS components have been detected in groundwater samples collected from the Plaintiff's and Class Members' private household water supply wells.

214.     The Defendants continued to manufacture, sell, and/or distribute AFFF containing toxic PFAS components sold to airports, ANG facilities, and fire department and used at SFR Airport and Santa Fe AASF.

215.     Concentrations of toxic PFAS components from Defendants' AFFF found in the wells throughout the Class Area have been caused by SFR Airport and Santa Fe AASF's releases of Defendants' AFFF into the environment. As was reasonably foreseeable by Defendants, the fire training, fire response, and other uses of AFFF occurred on, and/or resulted in discharges to, open ground and stormwater systems. As was reasonably foreseeable by Defendants, the toxic PFAS components in AFFF migrated into and through the soil and groundwater and from there migrated to and contaminated soil and groundwater on or beneath property owned by the Plaintiff and Class Members and contaminated the groundwater, household water supply, water supply systems, wells, piping, and other property. The PFAS contamination of Plaintiff' and Class Members' property has been, and is, directly caused by Defendants' manufacture and/or distribution and sale of AFFF, and its toxic PFAS components.

37

216. It was and is reasonably foreseeable to Defendants that the Plaintiff's and Class Members' property rights and interests would be, and will be, harmed by contamination resulting from releases of AFFF, and its toxic PFAS components, at and around SFR Airport and Santa Fe AASF.

217. Defendants knowingly manufactured, sold, and/or distributed a dangerous and defective product, AFFF containing toxic PFAS components, failed to provide sufficient warnings to the Plaintiff and Class Members, and failed to recall their products when they took them off the market and/or knew them to present a hazard to human health.

218. Defendants' internal memorandums proclaimed that "no reason" existed to alert outside agencies or the public to the toxic characteristics of PFAS despite repeated, consistent internal studies concluding PFAS are toxic, bioaccumulate, biomagnify, and are persistent in the environment and in human tissue. Defendants' failure to act on such information made it practically certain that a known toxic substance, PFAS, would continuously stream into the environment and contaminate Plaintiff's and Class Members residential real property, water supplies, water systems, wells, piping, and other property. As a direct and proximate cause of the costs Plaintiff and Class Members have suffered and will continue to suffer harms and losses in the form of contaminated residential real property, water supplies, water systems, wells, piping, and other property.

219. Defendants knowingly manufactured, sold, and/or distributed a dangerous and defective product, AFFF containing toxic PFAS components, failed to provide sufficient warnings to protect bystanders, such as the Plaintiff and Class Members, and failed to recall or redesign their products when they took them off the market and/or knew them to present a hazard to human health and Plaintiff's and Class Members' property

rights and interests.

220.     Non-PFAS based products were available for fire suppression that would not have led to contamination of Plaintiff's and Class Members' private drinking water supply.

221.     Upon information and belief, Defendants control a substantial share of the market in the United States for AFFF containing toxic PFAS components and are jointly responsible for the contamination of the groundwater, soil, and household water supplies in the Class Area and causing the harms and losses the Plaintiff and Class Members have and will suffer.

### The Use, Storage, Release, Discharge, and Disposal of PFAS From AFFF at SFR Airport and Santa Fe AASF Has Contaminated Plaintiff's and Class Members' Water Supply, and Properties

222.     November 2018, a single-engine Mooney M20 crashed just short of the runway and burst into flames at SFR Airport, prompting an emergency firefighting response.[24]

223.     April 2019, a small, single-engine plane crashed, and the two-seater aircraft was destroyed by fire at SFR Airport, prompting an emergency firefighting response. [25]

224.     A May 2020 DoD "Per- and Polyfluoroalkyl Substances (PFAS) Task Force Progress Report", confirmed that the DoD began using AFFF that contained PFOS

---

[24] Edge, Sami. November 27, 2018. Family describes man who died in Santa Fe plane crash as an experienced pilot. Santa Fe New Mexican. Date accessed: February 23, 2024. https://www.santafenewmexican.com/news/local_news/family-describes-man-who-died in-santa-fe-plane-crash/article_8c97f3bd-2364-5247-8f05-ea4bb36e86cb.html

[25] Mullan, Dillon. April 08, 2019. Plane crash at Santa Fe airport kills 2. Santa Fe New Mexican. Date accessed: February 23, 2024. https://www.santafenewmexican.com/news/local_news/plane-crash-at-santa-fe-airport kills/article_298804ea-e8f0-591b-8ff7-a8a84dcd72cc.html.

and, in some formulations, PFOA, in the 1970s. Including at Army National Guard facilities.[26]

225.    In response to the disclosure that PFAS were found in groundwater samples collected at the Santa Fe AASF, the Santa Fe County Department of Public Works sought to identify whether PFAS was present in groundwater in the La Cienega and La Cieneguilla areas (Class Area). Santa Fe County sampled groundwater from six (6) different wells in the La Cienega and La Cieneguilla areas. Test results showed the presence of PFAS in samples from five (5) of the wells.[27]

226.    In 2019, the ANG informed New Mexico Environmental Department ("NMED") that it was beginning a Preliminary Site Assessment at the Santa Fe AASF … . NMED received the final site investigation report in October of 2023, and is finalizing its review of the over 22,000-page report. NMED is evaluating the sampling data from the site investigation performed by the ANG and coordinating with the ANG as they move forward with further site investigation to identify the nature and extent of the PFAS contamination.[28]

227.    In 2023, the ANG presented the Site Inspection Conceptual Site Model at the Technical Project Planning (TPP) Meeting 3; illustrating the source of PFAS contamination at Santa Fe AASF as Area of Concern 1 (AOC 1), with the release mechanism being AFFF tank in a Firetruck and/or Tri-Max™ Hand Truck to surface soil and paved tarmac, which leached and/or infiltrated to groundwater, which now poses an

---

[26] Army National Guard Bureau, "Final Preliminary Assessment Report Santa Fe Army Aviation Support Facility Santa Fe, New Mexico". August, 2020.

[27] PFAS (Polyfluorinated Substances) | Santa Fe County (santafecountynm.gov)

[28] 2024-02-22-COMMS-Environment-Department-provides-update-on-PFAS-contamination-near-the-Santa-Fe-Airport-Final.pdf

ingestion exposure route (potentially complete pathway with exceedance of screening level) to residents outside of the facility boundaries. [29]

228. TPP Meeting 3 material also presented a Draft Relative Risk Site Evaluation (RRSE) rating the groundwater at Santa Fe AASF as a high risk for potential receptor exposure within 4-miles. *Id.*

229. The concentrations of PFAS found in the groundwater near SFR Airport and Santa Fe AASF has been caused by or contributed to by releases of AFFF at SFR Airport and Santa Fe AASF to the environment. As was reasonably foreseeable by Defendants, the training and other exercises and emergency fire responses occurred on or near open ground and at times were discharged to open ground. As was reasonably foreseeable by Defendants, the foam, and its contents, including PFAS, migrated into and through the soil in and around SFR Airport and Santa Fe AASF to the groundwater under SFR Airport and Santa Fe AASF, and from there migrated to groundwater wells in the Class Geographic Area that have been contaminated. The PFAS contamination is therefore directly linked to Defendants' manufacture, distribution, and sale of AFFF.

230. It was reasonably foreseeable to Defendants that Plaintiff and the Plaintiff Class, as users of groundwater that supplied wells near SFR Airport and Santa Fe AASF, would use and consume groundwater affected by AFFF releases at SFR Airport and Santa Fe AASF, and would be damaged by such releases.

231. Defendants knowingly manufactured, sold, and distributed a dangerous and defective product, failed to provide sufficient warnings to protect bystanders, such as the Plaintiff and the Plaintiff Class, and failed to recall their products when they took them

---

[29] Presentation_AASF_SF_04Apr2023 - DocumentCloud

off the market.

232.    Groundwater wells tested within the Class Area have shown elevated concentrations of PFAS.

233.    As a direct and proximate result of the contaminated groundwater and contaminated household water near SFR Airport and Santa Fe AASF, Plaintiff and the Plaintiff Class have suffered annoyance and discomfort, loss of use and enjoyment of their properties, certain costs of alternate water supply, and their property rights have been affected.

### The Threats To Plaintiff's, Class Members', and Their Visitors' Health, Safety, And Property Caused By AFFF Are Ongoing

234.    The PFAS contamination caused by Defendants AFFF is not contained and continues to spread into Plaintiff's and Class Members' property and household water supplies. As result, Plaintiff's and Class Members' have suffered the annoyance, inconvenience, and discomfort of knowing that for years their health along with their family, friends, and visitors' health was compromised by exposure to toxic PFAS components.

235.    If Plaintiff's and Class Members' residential real property, water supplies, water systems, wells, piping, and other property are not remediated, PFAS contamination will continue to impact Plaintiff's and Class Members' property and household water far into the future because toxic PFAS components resist degradation and are persistent and mobile in water and soil.

### Plaintiff and Class Members Have Been Harmed by Defendants' Actions

236.    Plaintiff and Class Members hereby incorporate by reference the allegations contained in the proceeding paragraphs as if fully set forth herein.

237.    Because of Defendants' design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, Plaintiff and Class Members properties have been and are being invaded by toxic PFAS components released on and around SFR Airport and Santa Fe AASF.

238.    As a direct and proximate result of the contaminated groundwater near SFR Airport and Santa Fe AASF, the Plaintiff and Class Members have suffered, and will continue to suffer, harm and losses.

239.    AFFF, and its toxic PFAS components, sold by the Defendants to SFR Airport and Santa Fe AASF used in an intended and foreseeable manner, were released onto SFR Airport and Santa Fe AASF property. Thereafter toxic PFAS components in AFFF migrated into surrounding groundwater and physically intruded onto, and contaminated, Plaintiff's and Class Members' properties, including residential real property, water supplies, water systems, wells, piping, and other property in the Class Area. PFAS contamination of Plaintiff's and Class Members' household water supplies, caused by Defendants' AFFF, has further migrated through soils into groundwater, physically contaminating and interfering with Plaintiff's and Class Members' right to use their household water supplies.

240.    It was reasonably foreseeable that releases of Defendants' AFFF, and its toxic PFAS components, would migrate to Plaintiff's and Class Members' properties in the Class Area and physically intrude onto, harm, and contaminate those properties including Plaintiff's and Class Members' residential real property, water supplies, water systems, wells, piping, and other property owned and used by Plaintiff and Class Members. Releases of Defendants' AFFF, and its toxic PFAS components, has invaded and interfered

with Plaintiff's and Class Members' possessory interest in the use of their properties and household water supplies.

241.    Defendants knew or reasonably should have known of the aforementioned environmental and health risks associated with AFFF containing toxic PFAS components at minimum thirty-five years prior to the first time Plaintiff and Class Members were informed of PFAS contamination.

242.    Plaintiff's and Class Members' household properties and water supplies have been and are being exposed to PFAS introduced into their residential real property, water supplies, water systems, wells, piping, and other property because of Defendants' AFFF, and its toxic PFAS components, released into the environment at and near SFR Airport and Santa Fe AASF. As a direct and proximate result of these releases, Plaintiff and Class Members have suffered harms and losses including, but not limited to, those identified below.

243.    Plaintiff and Class Members have lost the use and use and enjoyment of their property as a direct result of the contamination of their private wells.

244.    Plaintiff and Class Members have suffered annoyance and inconvenience as a direct result of Defendants' contamination of their property including, but not limited to, using bottled water, alternative water sources, and installation and the cost of filtration systems as a direct result of the contamination of their private wells and avoiding consumption of their household water supply.

245.    As a direct result of the contamination of Plaintiff's and Class Members' private property in the Class Area, Plaintiff and Class Members have been suffered harms and losses. The use, value, and marketability of Plaintiff's and Owner Class Members'

44

private property has been and will continue to be substantially and adversely harmed and diminished, including their ability to use and enjoy their property. Plaintiff's and Owner Class Members' residential real properties have suffered the need for and the cost of remediation of the PFAS contamination of their properties water supplies, water systems, wells, piping, and other property. Plaintiff and Private Property Owner Class Members have suffered and will continue to suffer the cost of mitigating the PFAS contamination, caused by Defendants' AFFF, including the cost of obtaining water filters and/or alternative water supplies, and the cost of restoring, using, and maintaining an uncontaminated water supply and/or the increased cost of water supplies.

246.    PFAS have harmed Plaintiff and Class Members and will continue cause them to suffer harms and losses because the PFAS contamination on their property, caused by Defendants' AFFF, will persist for decades in water and soil and will bioaccumulate in plants and other organisms that exist in the Class Area.

247.    Since Plaintiff and Class Members learned of the PFAS contamination, they have been and will continue to be forced to suffer lost time as they direct their efforts, energy, resources, and money toward ensuring they have an alternative water supply and are not needlessly exposed to toxic PFAS components from Defendants' AFFF. Plaintiff and Class Members have incurred past and present costs directed toward securing alternative water supplies for protection from exposure to toxic PFAS components.

248.    Plaintiff and Class Members seek compensation for the loss of use, loss of enjoyment of their properties, annoyance, discomfort, and inconvenience caused by the contamination of their properties by Defendants' AFFF containing toxic PFAS components.

249.     Defendants' toxic PFAS contamination of the Class Area has caused Plaintiff and Class Members many forms of annoyance and discomfort, including, but not limited to, concern over reduction in the value of their property and investment value of their property. Plaintiff and Class Members have also experienced serious concerns over, how and where to obtain sufficient alternative water supplies, how and where to store sufficient water supplies, and whether their families', friends', and visitors' health and safety have been compromised from exposure to PFAS contaminated water in their homes.

250.     PFAS contamination prevents Plaintiff and Class Members from fully using their property, including private household wells.

251.     It was reasonably foreseeable to Defendants that Plaintiff and Class Members, as owners of residential real property and users of groundwater that supplied their household water, would consume groundwater contaminated by toxic PFAS components contained in AFFF released from on and around SFR Airport and Santa Fe AASF.

252.     Because precise identification of the specific manufacturer of any given AFFF that was the source of toxic PFAS components found in Plaintiff's and Class Members' household water supply is difficult, Defendants are jointly and severally liable for those indivisible harms and losses which they caused Plaintiff and Class Members to suffer.

253.     Upon information and belief, Defendants control a substantial share of the market in the United States for AFFF containing toxic PFAS components and are jointly responsible for the contamination of the groundwater, soil, household water supplies, and other property in the Class Area and for causing the harms and losses the Plaintiff and

Class Members have and will suffer.

254. Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, including PFOS and PFOA, to profit from the use of AFFF containing toxic PFAS components, at Plaintiff's and Class Members' expense, to foreseeably contaminate Plaintiff's and Class Members' household water supplies, and to attempt to avoid liability for such contamination of the groundwater.

255. Each of these Defendants participate in a state-wide and national market for AFFF containing toxic PFAS components during the relevant time. Therefore, enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of liability for the manufacture, sale, and/or distribution and subsequent release of AFFF containing toxic PFAS components at issue in this Complaint.

256. Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein. Each Defendant acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing toxic PFAS components.

257. Enterprise liability attaches to all the named Defendants for placing a defective product, AFFF containing toxic PFAS components, into the stream of commerce.

## CLASS ACTION ALLEGATIONS

258. Plaintiffs incorporate the foregoing paragraphs of this Complaint as though fully set forth herein.

259. Plaintiffs bring this action as a class action pursuant to Rule 1-023(A)(B)(3) NMRA on behalf of a Plaintiff Class consisting of all other persons similarly situated as members of the proposed classes.

260.    This action is brought by the Plaintiffs on their own behalf and as representatives of the Plaintiff Class defined herein.

261.    The members of the Plaintiff Class are defined as:

All persons who own residential properties in the geographic area defined as La Cieneguilla and La Cienega communities south of Santa Fe, New Mexico bound to the north by the Santa Fe Municipal Airport, bound to the west and south by Paseo Road (including properties along Cll Corto, Cam Largo, and Camino Mocho Roads) to the intersection with Los Pinos Road. Bound to the south and east by Los Pinos Road and the intersection of Paseo De Angel North (including properties along Paseo De Angel North and Rancho Sin Vacas Roads). ("the Class Geographic Area").

*See* Appendix A attached hereto (outlining the Class Geographic Area and incorporated herein).

262.    Excluded from the Plaintiff Class are: (a) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (b) the Judge to whom this case is assigned and the Judge's staff; (c) any class counsel or their immediate family Members; (d) and any State or any of its agencies.

263.    The Plaintiff Class satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 1-023(A)(B)(3) NMRA.

**Numerosity**

264.    The members of the Plaintiff Class are numerous, and joinder of all members is impracticable. The population in the Class Geographic Area is estimated to include approximately 590 properties utilizing groundwater wells, with sometimes multiple occupants. Plaintiffs believe that there are hundreds of members of the Plaintiff Class who own and/or occupy properties have been impacted by PFAS from Defendants' AFFF as described herein. Class Members can be easily identified from public records, such as property tax records, and other public records, and notified of the pendency of this

action by mail or via other public forums.

## Typicality

265.    Plaintiff's claims are typical of the claims of the members of the Plaintiff Class since all members of the Plaintiff Class are similarly affected by Defendants' conduct resulting in injury to all members of the Plaintiff Class.

## Adequate Representation

266.    Plaintiff will fairly and adequately protect the interests of members of the Plaintiff Class and have retained counsel competent and experienced in class action and environmental litigation.

267.    Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Plaintiff Class and have the resources to do so.

268.    Neither Plaintiff nor their counsel has interests adverse to any of the Plaintiff Class.

## Predominance of Common Questions

269.    Plaintiffs bring this action under Rule 1-023(A)(B)(3) NMRA because numerous questions of law and fact common to class members predominate over any question affecting only individual members. The answers to these common questions will advance resolution of the litigation as to all Plaintiff Class members. These common legal and factual issues include:

(i)    Whether Defendants owed a duty to Plaintiff and members of the Plaintiff Class and whether Defendants breached that duty;

(ii)   Whether Defendants knew or should have known that their manufacture of AFFF containing PFAS and perhaps other toxic chemicals was

49

unreasonably dangerous;

(iii) Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate groundwater water supplies;

(iv) Whether Defendants failed to sufficiently warn users of the potential for harm that resulted from use of their products;

(v) Whether Defendants became aware of health and environmental harm caused by PFAS in their AFFF products and failed to warn users and Plaintiff and the Plaintiff Class of same; and

(vi) Whether the members of the Plaintiff Class have sustained damages and the proper measure of damages.

(vii) Whether Defendants are strictly liable to Plaintiff and the Plaintiff Class for their actions;

(viii)Whether Defendants were unjustly enriched by their actions at the expense of Plaintiff and the Plaintiff Class.

### Superiority

270.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.

271.     Defendants have acted on grounds generally applicable to the Plaintiff Class, thereby making appropriate final legal and equitable relief with respect to the Plaintiff Class as a whole.

272.     Furthermore, the expense and burden of individual litigation outweighs the individual damages suffered by individual Class Members, making it impossible for

members of the Plaintiff Class to individually redress the wrongs done to them.

273.    Plaintiff Class treatment of common questions of law and fact will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

274.    There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### NUISANCE
(All Defendants)

275.    Plaintiff and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

276.    Defendants' manufacture, sale, and/or distribution of AFFF containing toxic PFAS components constitutes intentional, negligent and/or unreasonably dangerous activity causing unreasonable and substantial interference with the use and enjoyment Plaintiff's and Class Members' property interests.

277.    Defendants knew and/or should have reasonably foreseen that the invasion of the Plaintiff's and Class Members' property interests, including their household water supplies, water systems, wells, piping, and other property were substantially certain to result from the use of AFFF, and its toxic PFAS components, as Defendants intended, including by SFR Airport and Santa Fe AASF. Defendants participated to a substantial extent in the creation, and carrying on, of the nuisance by its actions described above.

278.    Defendants' unreasonable and substantial interference with the use and enjoyment of the Plaintiff's and Class Members' property interests includes, but is not limited to, the contamination of their household water supplies, water systems, wells,

51

piping, and other property, the need to obtain alternative sources of water and expense thereof, and the exposure to known toxic PFAS manufactured and/or sold and distributed by Defendants.

279. Toxic PFAS components continue to contaminate Plaintiff's and Class Members' properties and continue to migrate to Plaintiff's and Class Members' properties.

280. As a direct result of Defendants' creation of a nuisance, the household water supply of private wells relied upon by Plaintiff and Class Members and their residential real property was contaminated with toxic PFAS components.

281. Defendants' creation of a nuisance caused, is causing, and will continue to cause substantial and unreasonable interference with Plaintiff and Class Members property rights.

282. As a direct result of Defendants' conduct, as set forth above, Plaintiff's and Class Members' property rights and interests, including their rights to free and unthreatened use and enjoyment of their property, has been and will be interfered with unreasonably.

283. Defendants' invasion of Plaintiff's and Class Members' properties was intentional and unreasonable.

284. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the Plaintiff's and Class Members' rights and property. Defendants knew or should have known their actions and inactions were substantially certain to interfere with and invade Plaintiff's and Class Members' property rights and interests.

285. Defendants have known for years, or reasonably should have known, that their continued design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS

components, was substantially certain to result in releases into the household water supplied, water systems, wells, piping, and other property in the Class Area thereby contaminating Plaintiff's and Class Members' water supply and exposing them to toxic PFAS components.

286.    Defendants' actions and inactions in creating these conditions have caused, are causing, and will continue to cause unreasonable interference with Plaintiff's and Class Members' use and enjoyment of their property.

287.    As a direct result of Defendants' conduct and resulting contamination of Plaintiff's and Class Members' household water supply, water systems, wells, piping, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiff and Class Members have incurred and will incur harms and losses.

## SECOND CLAIM FOR RELIEF
## NEGLIGENCE
(All Defendants)

288.    Plaintiff and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

289.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF containing toxic PFAS components.

290.    Defendants had a duty to manufacture, market, sell, and/or distribute their AFFF in a manner that avoided contamination of the environment and household water supplies with known hazardous substances and avoided harm to those who would foreseeably be subject to exposure to its toxic PFAS components.

291.    This duty included identifying, designing, using, and manufacturing

53

alternatives to the toxic PFAS components in its AFFF.

292.    Defendants knew or should have known that the manufacture of AFFF containing toxic PFAS components was hazardous to human health and the environment. Knowing of the dangerous and hazardous properties of the AFFF, Defendants had the duty to warn of the hazards of ingesting water containing toxic PFAS components.

293.    Defendants knew or should have known that it was unsafe, unreasonably dangerous, and/or hazardous to manufacture AFFF using toxic PFAS components because such components would migrate into the environment, including at airports and ANG facilities such as SFR Airport and Santa Fe AASF, and contaminate the groundwater used to supply Plaintiff's and Class Members' household water supply.

294.    Given the likelihood that sites where Defendants sold and/or distributed AFFF, including SFR Airport and Santa Fe AASF, would become contaminated with toxic PFAS components, Defendants had a duty to investigate the extent to which the toxic PFAS components in AFFF released from such sites were likely to contaminate Plaintiff's and Class Members' properties and household water supplies.

295.    Knowing of the dangerous and hazardous properties of toxic PFAS components in AFFF, Defendants had the duty to warn of the hazards of ingesting water containing PFAS.

296.    The Plaintiff and Class Members were foreseeable victims of the harm caused by toxic PFAS components in Defendants' AFFF.

297.    Defendants negligently designed, engineered, developed, fabricated, and tested AFFF, and its toxic PFAS components, and the associated warnings, or lack thereof, and thereby failed to exercise reasonable care to prevent the AFFF, and its toxic PFAS

components, from presenting an unreasonable risk of harm to human health and the environment and persons who would come in contact with it, including Plaintiff and the Class Members.

298. As a direct result of Defendants' breaches of their legal duties, the household water and private wells surrounding SFR Airport and Santa Fe AASF including the affected household water supplies, water systems, piping, wells, and other property in the Class Area, have been, and at continue to be, contaminated with toxic PFAS components.

299. As a direct result of Defendants' negligent, reckless and/or intentional acts and omissions alleged herein, groundwater and private wells supplying Plaintiff's and Class Members' household water have been contaminated with toxic PFAS components.

300. Defendants' negligent manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, and their negligent misrepresentation and failure to warn has interfered with, and continues to interfere with, the property rights of Plaintiff and Class Members.

301. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of Plaintiff and Class Members.

302. As a direct result of Defendants' conduct and resulting contamination of Plaintiff's and Class Members' household water supply, water systems, wells, piping, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiff and Class Members have incurred and will incur harms and losses.

### THIRD CLAIM FOR RELIEF
### NEGLIGENT FAILURE TO WARN
(All Defendants)

303.     Plaintiff and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if they were fully set forth herein.

304.     At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF containing toxic PFAS components.

305.     As manufacturers, sellers, and distributors of a commercial product, AFFF containing toxic PFAS components, the Defendants had a duty to provide full and adequate instructions and warnings about the health or injury risks posed by their products.

306.     Defendants knew or should have known that the foreseeable storage, use, and disposal of the AFFF, and its toxic PFAS components, that they manufactured, sold, and/or distributed to airports and ANG facilities, including SFR Airport and Santa Fe AASF, would enter the water supply, persist there for decades, and cause risks to human health, the environment, and harm property.

307.     At the time of the design, manufacture, sale, and/or distribution of their AFFF, Defendants knew or should have known of the dangerous properties of toxic PFAS components contained in AFFF.

308.     At significant times Defendants knew of the dangerous properties of toxic PFAS components contained in AFFF and failed to provide sufficient warnings to the users of AFFF, including SFR Airport and Santa Fe AASF, that use and release of Defendants' AFFF to the environment would result in the contamination of groundwater and household water supplies and health risks to those exposed through water supplies.

309.     Upon information and belief, the Defendants failed to provide adequate warnings to the users of the dangers to human health and the environment if toxic PFAS

components in AFFF were permitted to contaminate the groundwater and water supplies.

310.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release the AFFF containing toxic PFAS components.

311.    Had Defendants provided adequate warnings, the users of their AFFF would have either not used AFFF, or taken measures to store, use, and dispose of AFFF in a manner that reduced or eliminated PFAS contamination of groundwater and household water supplies in the Class Area.

312.    As a direct and proximate result of Defendants' failure to warn against the likelihood of PFAS contamination from their AFFF, the groundwater and household water in the Class Area has been contaminated with toxic PFAS components, and has caused contamination of, and harms and losses to, the Plaintiff's and Class Members' real property rights and interests.

313.    Defendants' failure to provide adequate warnings or instructions renders Defendants' AFFF, and its toxic PFAS components, a defective product.

314.    As a direct result of Defendants' manufacture, sale, and/or distribution of a defective product, AFFF containing toxic PFAS components, Defendants are strictly liable for harms and losses suffered by the Plaintiff and Class Members.

315.    Defendants' acts were willful, wanton, and/or reckless and conducted with a reckless indifference to the rights of Plaintiff and Class Members.

316.    As a direct result of Defendants' conduct and resulting contamination of Plaintiff's and Class Members' household water supply, water systems, wells, piping, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiff and

Class Members have incurred and will incur harms losses.

## FOURTH CLAIM FOR RELIEF
### DEFECTIVE PRODUCT – DEFECTIVE DESIGN
(All Defendants)

317.    Plaintiff and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

318.    At all times relevant, Defendants were in the business of, among other things, manufacturing, selling and/or otherwise distributing AFFF, and its toxic PFAS components.

319.    It was foreseeable that toxic PFAS components in AFFF that Defendants manufactured, sold, and/or distributed would enter the water supply of the Plaintiff and Class Members and cause exposure, harm, and losses to their persons and property.

320.    Alternative designs and formulations of AFFF without toxic PFAS components were available, technologically feasible, practical, effective, and would have reduced or prevented the reasonably foreseeable risks of harm and losses suffered by Plaintiff and Class Members.

321.    Further, design, formulation, manufacture, sale, and/or distribution of AFFF containing toxic PFAS components that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

322.    AFFF manufactured, sold, and/or distributed by the Defendants was defective in design because the foreseeable risk of harm posed by the toxic PFAS components in AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous. Because Defendants have failed to do so, they continue to sell and distribute an unreasonably

58

dangerous product, AFFF containing toxic PFAS components.

323. Defendants' AFFF containing toxic PFAS components were defective at the time of manufacture, and thus, at the time they left Defendants' control.

324. As a direct result of Defendants' manufacture, sale and/or distribution of a defectively designed product, the groundwater, household water supplies, and properties in the Class Area became contaminated with toxic PFAS components and caused Plaintiff and Class Members to suffer significant harms and losses.

325. As a direct result of Defendants' design, formulation, manufacture, sale and/or distribution of a defective product, Defendants are strictly liable for the harms and losses suffered by the Plaintiff and Class Members.

326. Defendants' acts were willful, wanton, and/or reckless and conducted the design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, with a reckless indifference to the rights of Plaintiff and Class Members.

327. As a direct result of Defendants conduct and resulting contamination of Plaintiff's and Class Members' household water supply, water systems, wells, piping, and other property, by the toxic PFAS components of the Defendants' AFFF, the Plaintiff and Class Members have incurred and will incur harms and losses.

## FIFTH CLAIM FOR RELIEF TRESPASS
(All Defendants)

328. Plaintiff and Class Members incorporate the allegations in the preceding paragraphs as if fully set forth herein.

329. Defendants took intentional actions and made intentional omissions in the manufacture, sale and/or distribution of AFFF, and its toxic PFAS components, which in their natural course caused the PFAS contamination of the Plaintiff's and Class Members'

household water supply. Defendants deliberate and intentional design, manufacture, marketing, sale, and/or distribution of AFFF that contained toxic PFAS components made it natural, inevitable, and a substantial certainty that releases of such AFFF from SFR Airport and Santa Fe AASF would migrate into and contaminate household well water supplies in the Class Area.

330. Plaintiff and Class Members in no way consented or provided permission to Defendants' conduct which inevitably resulted in AFFF, and its toxic PFAS components, entry onto and contamination of Plaintiff's and Class Members' residential real property. As a result, Plaintiff's and Class Members' household water supply, water systems, wells, piping, and other property were invaded and contaminated by toxic PFAS components in Defendants' AFFF. These trespasses occurred in the past, are occurring, and will continue to occur.

331. As a result of the Defendants' design, manufacture, sale, and/or distribution of AFFF containing toxic PFAS components, releases of AFFF SFR Airport and Santa Fe AASF have physically intruded onto and wrongfully entered the properties owned by Plaintiff's and Class Members', including their private wells and household water. Defendants' wrongful intrusions onto Plaintiff's and Class Members' properties has interfered, and continues to interfere, with Plaintiff's and Class Members' possessory interest in their properties without Plaintiff's or Class Members' permission.

332. The physical intrusion of toxic PFAS components contained in Defendants' AFFF and released by SFR Airport and Santa Fe AASF onto and into Plaintiff's and Class Members' properties has physically harmed their properties, including contaminating their properties household water supply, water systems, wells,

60

piping, and other property with toxic PFAS components. As a result, Plaintiff and Class Members have suffered, and will continue to suffer, significant harms and losses.

333.    The toxic PFAS components from Defendants' AFFF contaminating Plaintiff's and Class Members' properties would not have been, and would not be, present but for the Defendants tortious acts and omissions. Further, Plaintiff and Class Members would not have been exposed to toxic PFAS components but for Defendants' tortious conduct. The physical intrusion of Defendants' toxic PFAS components onto property owned by Plaintiff and Class Members have caused significant harms and losses.

334.    Defendants actually and proximately caused the PFAS contamination of Plaintiff's and Class Members' residential real property and household water supply. Defendants' tortious conduct was a substantial factor in the design, manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components, intended for use, discharge, release, and disposal of AFFF at SFR Airport and Santa Fe AASF which migrated into Plaintiff's and Class Members' residential real property and household water supplies.

335.    As a direct result of Defendants conduct and resulting contamination of Plaintiff's and Class Members' household water supply, water systems, well, piping, and other real property by the toxic PFAS components of the Defendants' AFFF, the Plaintiff and Class Members have incurred and will incur losses.

### SIXTH CLAIM FOR RELIEF UNJUST ENRICHMENT
(All Defendants)

336.    Plaintiff and Class Members incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

337.    Plaintiff and Class Members have conferred a benefit upon the Defendant by bearing the burden of the PFAS contaminated groundwater, household water supply,

61

water systems, wells, piping, and other property that would not have been, and would not be, present but for the Defendants' tortious conduct. Because the Defendants have failed, and refused to, take responsibility for the costs of the pervasiveness, persistence, and toxicity, their AFFF, and its toxic PFAS components, they have saved substantial sums of money they otherwise should have been required to expend to avoid the harms and losses suffered by the Plaintiff and Class Members. Instead, Plaintiff and Class Members have been forced to take it upon themselves to incur the cost to mitigate the PFAS contamination of their household water supply, water systems, wells, piping, and other property, the lost time of addressing such contamination issues, and the annoyance, discomfort, and inconvenience caused by their property's contamination.

338.    Defendant knew or should have known of the benefit that Plaintiff and Class Members have been and continue to confer upon them. Defendants profited from the manufacture, sale, and/or distribution of AFFF, and its toxic PFAS components. Defendants continued to profit from the manufacture, sale, and/or distribution of such AFFF, and its toxic PFAS components, for decades after they knew or should have known the environmental and health risks they posed. Therefore, Defendants had knowledge of the profit they were receiving, and continue to receive, at the expense of the harms and losses incurred by Plaintiff and Class Members.

339.    Defendants knew or should have known that the toxic PFAS components in their AFFF caused harms and losses to Plaintiff's and Class Members' property rights and interests which Defendants did not bear the financial cost to correct. This conduct resulted in a benefit to the Defendants, and they have not been required to shoulder the burden of the harms and losses Plaintiff and Class Members have suffered.

340.    Defendants have accepted and/or retained the benefit Plaintiff and Class Members have conferred, and continue to confer, upon them under circumstances such that it is inequitable for them to retain the benefit gained without payment to the Plaintiff and Class Members. Defendants profited from the manufacture and sale of AFFF, and its toxic PFAS components, at the expense of Plaintiff and Class Members properties and health and continued to do so long after they were aware of the environmental and health risks of their AFFF. Defendants have failed to redesign or recall their products to prevent further release of their AFFF, and its toxic PFAS components, into the environment and Plaintiff's and Class Members' groundwater, water systems, and household water supply. Plaintiff and Class Members have been harmed, and suffered losses, by this conduct and are unable to bear the burden of Defendants' consciously, tortiously, wrongful acts and omissions have caused.

341.    It is inequitable for Plaintiff and Class Members to suffer the harms and losses caused by Defendants' actions and omissions when Defendants knew, should have known, and/or disregarded the risk that the toxic PFAS components contained in AFFF were highly mobile, persistent, toxic, bioaccumulative, and likely to be released into Plaintiff's and Class Members' water supply through its intended use.

342.    Through Defendants' actions and inaction at the expense of Plaintiff and the Class Members, Defendants have been unjustly enriched.

343.    The Court should award as a remedy the expenditures saved and the profits obtained by Defendants at the expense of Plaintiff and the Class Members.

### DAMAGES SOUGHT BY THE CLASS

344.    Plaintiff hereby incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint as if they were set forth at length herein.

345.    Plaintiff and the Plaintiff Class seek compensation for decrease in the value and marketability of the property and property rights of Plaintiff owners and the Class Member owners have been and will continue to be diminished, the need for and the cost of remediation of class properties and/or mitigation systems for those properties, and the costs incurred for alterative water. Plaintiff and the Plaintiff Class seek compensation for the loss of use, loss of use and enjoyment of their properties, and their annoyance, discomfort, and inconvenience caused by the contamination of their properties by Defendants' PFAS.

346.    Plaintiff and the Class seek exemplary damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

(a.)    An order certifying the Class pursuant to Rule 1-023(A)(B)(3) NMRA, designating Plaintiff as the named representatives of the Class, and designating the undersigned as Class Counsel;

(b.)    An order certifying the Class under Rule 1-023(A)(B)(3) NMRA;

(c.)    An award to Plaintiff and Class Members of compensatory damages, including interest, in an amount to be proven at trial;

(d.)    For disgorgement of the profits and savings which were obtained by the unjust enrichment of Defendants through their use of and at the expense of the properties of Plaintiff and the Class Members;

(e.)    For an award of exemplary damages;

(f.)    An award of attorneys' fees and costs as allowed by law;

(g.)    An award of prejudgment and post judgment interest, as provided by law; and

(h.)    Such other and further relief as the Court deems just and proper.

### SIX PERSON JURY DEMAND

Plaintiff demands a trial by jury of six under U.S. CONST. AMEND. VII and N.M. CONST. ART.

II, § 12 on all issues triable.

Dated: March 6, 2024

SINGLETON SCHREIBER LLP

By: */s/ Brian S. Colón*
**Brian S. Colón**
**Damon J. Hudson**
6501 Americas Parkway NE, Suite 670
Albuquerque, NM 87110
(505) 437-5066
bcolon@singletonschreiber.com
dhudson@singletonschreiber.com
*Counsel for the Plaintiff and Plaintiff Class*

By: */s/ Kevin S. Hannon,*
**Kevin S. Hannon**
1641 Downing Street
Denver, CO  80218
(303) 861-8800
khannon@singletonschreiber.com
*Admission Pro Hac Vice to Be Submitted*

# Class Geographical Area



 Class Geographical Area



Texas Parks & Wildlife, Esri, TomTom, Garmin, SafeGraph, GeoTechnologies, Inc, METI/NASA, USGS, Bureau of Land Management, EPA, NPS, USDA,

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
3/6/2024 3:33 PM
KATHLEEN VIGIL CLERK OF THE COURT
Mayra Mendoza-Gutierrez

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICAL DISTRICT COURT

JENNIFER STEKETEE;
for herself and on behalf
of all others similarly situated,

Plaintiffs,

v.                                                  Case No.   D-101-CV-2024-00569

THE 3M COMPANY (f/k/a Minnesota Mining and
Manufacturing Co.); TYCO FIRE PRODUCTS, L.P.,
successor-in-interest to The Ansul Company;
JOHNSON CONTROLS INTERNATIONAL, PLC;
CHEMGUARD, INC.; BUCKEYE FIRE
EQUIPMENT COMPANY; E.I. DUPONT DE
NEMOURS AND COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise; THE CHEMOURS COMPANY,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise; THE CHEMOURS
COMPANY FC, LLC, individually and as successor
in interest to DuPont Chemical Solutions Enterprise;
CORTEVA, INC.; DUPONT DE NEMOURS INC.,
f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC
CHEMICALS AMERICAS INC.;
DYNAX CORPORATION; CLARIANT
CORPORATION; BASF CORPORATION;
CHEMDESIGN PRODUCTS, INC.; AMEREX
CORPORATION; ARCHROMA MANAGEMENT
LLC; DEEPWATER CHEMICALS, INC.; NATION
FORD CHEMICAL COMPANY; CHEMICALS,
INC.; and KINGSWAY INDUSTRIES, INC.
(f/k/a Tri-Max KCAF Fire Technologies)

Defendants.

## PLAINTIFFS' 6-PERSON JURY DEMAND

Jennifer Steketee, for herself and on behalf of all others similarly situated, by and through

their attorneys, Singleton Schreiber LLP (Brian S. Colón, Damon J. Hudson and Kevin S.

Hannon), here demand a jury of six (6) and deposit One Hundred Fifty Dollars ($150.00) with the

Court.

Respectfully Submitted,

SINGLETON SCHREIBER LLP

By: /s/ Brian S. Colón
**Brian S. Colón**
**Damon J. Hudson**
6501 Americas Parkway NE, Suite 670
Albuquerque, NM 87110
(505) 437-5066
bcolon@singletonschreiber.com
dhudson@singletonschreiber.com
*Counsel for the Plaintiff and Plaintiff Class*

By: /s/ Kevin S. Hannon,
**Kevin S. Hannon**
1641 Downing Street
Denver, CO  80218
(303) 861-8800
khannon@singletonschreiber.com
*Admission Pro Hac Vice to Be Submitted*

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
4/2/2024 1:45 PM
KATHLEEN VIGIL CLERK OF THE COURT
Mariah Gonzales

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICAL DISTRICT COURT

JENNIFER STEKETEE;
for herself and on behalf
of all others similarly situated,

Plaintiffs,

v.                                                        Case No. D-101-CV-2024-00569

THE 3M COMPANY (f/k/a Minnesota Mining and
Manufacturing Co.); TYCO FIRE PRODUCTS, L.P.,
successor-in-interest to The Ansul Company;
JOHNSON CONTROLS INTERNATIONAL, PLC;
CHEMGUARD, INC.; BUCKEYE FIRE
EQUIPMENT COMPANY; E.I. DUPONT DE
NEMOURS AND COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise; THE CHEMOURS COMPANY,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise; THE CHEMOURS
COMPANY FC, LLC, individually and as successor
in interest to DuPont Chemical Solutions Enterprise;
CORTEVA, INC.; DUPONT DE NEMOURS INC.,
f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC
CHEMICALS AMERICAS INC.;
DYNAX CORPORATION; CLARIANT
CORPORATION;  BASF CORPORATION;
CHEMDESIGN PRODUCTS, INC.; AMEREX
CORPORATION; ARCHROMA MANAGEMENT
LLC; DEEPWATER CHEMICALS, INC.; NATION
FORD CHEMICAL COMPANY; CHEMICALS,
INC.; and KINGSWAY INDUSTRIES, INC.
(f/k/a Tri-Max KCAF Fire Technologies)

Defendants.

---

## NOTICE OF DISMISSAL WITHOUT PREJUDICE PURSUANT TO RULE 1-041(A) NMRA

---

Plaintiff initiated the above-captioned action by filing a Complaint against defendants that

included Johnson Controls International PLC. Defendant Johnson Controls International PLC has not

answered, moved, or otherwise responded to the Complaint. Pursuant to Rule 1-041(a)(1) NMRA, Plaintiff hereby dismisses the above-captioned action against Defendant Johnson Controls International PLC, only without prejudice. Plaintiff reserves the rights against all other defendants named in the above-captioned case.

Dated: April 2, 2024.

SINGLETON SCHREIBER LLP

By: */s/ Damon J. Hudson*
**Brian S. Colón**
**Damon J. Hudson**
6501 Americas Parkway NE, Suite 670
Albuquerque, NM 87110
(505) 437-5066
*Counsel for the Plaintiff and Plaintiff Class*

By: */s/ Kevin S. Hannon,*
**Kevin S. Hannon**
1641 Downing Street
Denver, CO  80218
(720) 704-6028
khannon@singletonshreiber.com
*Admission Pro Hac Vice to Be Submitted*

1

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing Notice of Dismissal Without Prejudice was electronically filed with this Court on April 2, 2024, and accordingly served automatically upon all counsel of record for these matters.

/s/ Damon J. Hudson
Damon J. Hudson

FILED 1st JUDICIAL DISTRICT COURT
Santa Fe County
4/23/2024 11:57 AM
KATHLEEN VIGIL CLERK OF THE COURT
Marquel Gonzales-A

STATE OF NEW MEXICO, COUNTY OF SANTA FE, FIRST JUDICIAL DISTRICT

| | |
|---|---|
| Jennifer Steketee, for herself and on behalf of all others similarly situated | Case No.:      **D-101-CV-2024-00569** |
|                       *Plaintiff/Petitioner* | |
| vs. | |
| **The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.); et al** | AFFIDAVIT OF SERVICE OF **Summons; Class Action Complaint; Jury Demand** |
|                    *Defendant/Respondent* | |

Received by **Daniel Ferreira**, on the **17th** day of **April, 2024** at **6:33 PM** to be served upon **Kingsway Industries, Inc.** **c/o Registered Agent: DAVID M. MAHRT, SR.** at **2066 ALEXANDER AVE, Anderson, Shasta County, CA 96007.** On the **18th** day of **April, 2024** at **1:34 PM**, I, Daniel Ferreira, SERVED Kingsway Industries, Inc. c/o Registered **Agent: DAVID M. MAHRT, SR.** at **2066 ALEXANDER AVE, Anderson, Shasta County, CA 96007** in the manner indicated below:

**CORPORATE SERVICE**, by personally delivering 1 copy(ies) of the above listed documents to the named Corporation, by serving **Shairty Mahrt, Operations Administrator**, on behalf of said Corporation.
THE DESCRIPTION OF THE PERSON WITH WHOM THE COPY OF THIS PROCESS WAS LEFT IS AS FOLLOWS: **I delivered the documents to Shairty Mahrt, Operations Administrator who identified themselves as the person authorized to accept with identity confirmed by subject showing identification. The individual accepted service with direct delivery. The individual appeared to be a brown-haired white female contact 55-65 years of age, 5'4" -5'6" tall and weighing 140-160 lbs.**

Service Fee Total: **$75.00**

Per 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

NAME:                              PS294                       4-19-24
       Daniel Ferreira                     Server ID #                   Date

Notary Public: Subscribed and sworn before me on this 19 day of April in the year of 2024
Personally known to me _____ or _____ identified by the following document: CALIFORNIA DRIVERS LICENSE

                                         Number/Reference: C1462728
                                         Type: State Drivers License
                             Notary Public for State of: California
Notary Public (Legal Signature)              Commission Expiration: June 28 2025

DEANNA AHLENSTORF
Notary Public - California
Shasta County
Commission # 2362302
My Comm. Expires Jun 28, 2025

REF: **AFFF - NM**

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 12:22 PM
KATHLEEN VIGIL CLERK OF THE COURT
Anna M Martinez

COUNTY OF SANTA FE
FIRST JUDICAL DISTRICT COURT
STATE OF NEW MEXICO

Civil Action No. D-101-CV-2024-00569

JENNIFER STEKETEE;
for herself and on behalf
of all others similarly situated,

      Plaintiffs,

v.

THE 3M COMPANY (f/k/a Minnesota Mining and
Manufacturing Co.); TYCO FIRE PRODUCTS, L.P.,
successor-in-interest to The Ansul Company;
JOHNSON CONTROLS INTERNATIONAL, PLC;
CHEMGUARD, INC.; BUCKEYE FIRE
EQUIPMENT COMPANY; E.I. DUPONT DE
NEMOURS AND COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
Enterprise; THE CHEMOURS COMPANY,
individually and as successor in interest to DuPont
Chemical Solutions Enterprise; THE CHEMOURS
COMPANY FC, LLC, individually and as successor
in interest to DuPont Chemical Solutions Enterprise;
CORTEVA, INC.; DUPONT DE NEMOURS INC.,
f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC
CHEMICALS AMERICAS INC.;
DYNAX CORPORATION; CLARIANT
CORPORATION;  BASF CORPORATION;
CHEMDESIGN PRODUCTS, INC.; AMEREX
CORPORATION; ARCHROMA MANAGEMENT
LLC; DEEPWATER CHEMICALS, INC.; NATION
FORD CHEMICAL COMPANY; CHEMICALS,
INC.; and KINGSWAY INDUSTRIES, INC.
(f/k/a Tri-Max KCAF Fire Technologies)

      Defendants.

---

**OUT OF STATE COUNSEL'S VERIFIED MOTION REQUESTING
PRO HAV VICE ADMISSION OF KEVIN S. HANNON**

---

      Pursuant Rule 24-106 N.M.R.A., Damon J. Hudson of Singleton Schreiber, LLP, moves for Pro

Hac Vice admission for Kevin S. Hannon to practice before this Court in the above-captioned matter.

AS GROUNDS FOR THIS MOTION, Kevin S. Hannon states and shows the Court the following:

1.      Rule 24-106 NMRA requires an attorney in good standing in another United States jurisdiction to submit a certificate of good standing from every jurisdiction in which the attorney is admitted.

2.      Mr. Hannon of Singleton Schreiber is a member in good standing of the Bar in the State of Colorado.  Mr. Hannon is assigned bar admission number 16015 in the State of Colorado.

3.      Mr. Hannon has also been admitted to practice before the following courts: District of Columbia, State of Missouri, State of New Hampshire, State of Wisconsin, State of Wyoming, United States District Court for the Western District of Missouri, United States District Court for District of New Hampshire, United States District Court for the Western District of Wisconsin, United States Court of Appeals 1st Circuit, United States Court of Appeals 8th Circuit, United States Supreme Court, and Unites States Court of Federal Claims.

4.      Mr. Hannon is in good standing in all Bars admitted and has not been subject to any order of discipline or disability by any Bar or had any request for pro hac vice admission denied or revoked.

5.      Mr. Hannon has not previously sought pro hac vice admission in New Mexico.

6.      Mr. Hannon acknowledges that he is subject to all appliable provisions of the New Mexico Rules of Professional Conduct, New Mexico Rules of Civil Procedure, and other court rules, and that he has read such rules and will follow such rules.

7.      I, Damon Hudson (New Mexico Bar No. 151731) am a member in good standing of the State of New Mexico Bar.

8.      I will be present and will participate in a meaningful and substantial manner

1

throughout the proceedings of this matter.

9.     The following are parties to the proceeding and have been notified of this Verified Motion requesting pro hac vice admission: Jennifer Steketee.

10.     Mr. Hannon has filed a Registration Certificate of Non-Admitted Lawyer with the State Bar of New Mexico, 5121 Masthead St. NE, Albuquerque, MN 87199, with attached certificates of good standing and paid the required fee.

11.     An affidavit (Ex. 2) and certificates of good standing (Ex. 1) setting forth Mr. Hannon's qualifications and compliance is attached.

WHEREFORE, Out of State Counsel respectfully requests that the Court admit Kevin S. Hannon pro hac vice to practice before the Court in this case.


Dated May 13, 2024.                              Respectfully submitted,

                                                 SINGLETON SCHREIBER, LLP

                                                 */s/ Damon J. Hudson*
                                                 Damon J. Hudson, Bar No. 151731
                                                 Singleton Schreiber, LLP
                                                 6501 Americas Parkway NE, Suite 670
                                                 Albuquerque, NM 87110
                                                 (505) 437-5066
                                                 dhudson@singletonschreiber.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 13th day of May, 2024 this **Out Of State Counsel's Verified Motion Requesting Pro Hav Vice Admission of Kevin S. Hannon** was served by E-Filing to the Court.

<u>*/s/ Brittany Ann Hansen*</u>
Brittany Ann Hansen, Paralegal.

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 12:22 PM
KATHLEEN VIGIL CLERK OF THE COURT
Anna M Martinez

# The State of New Hampshire
## Supreme Court

## Certificate of Good Standing

This is to certify that

### Kevin Scott Hannon

having been found qualified for admission to the bar, in accordance with the Rules of Court, and having subscribed and taken the oaths required by law on,

March 19, 2018,

was admitted to practice as an Attorney in the Courts of this State, and, on this date, is on active status and in good standing according to the records of this Court.

*In Testimony Whereof*, I have hereunto set my hand, and affixed the seal of said Court, this 19th day of March 2024

_____, Clerk

**Ex. 1**



**SUPREME COURT**

**State of Colorado.**

**STATE OF COLORADO, ss:**

I, _____**Cheryl Stevens**_**,** Clerk of the Supreme Court of t h e  S t a t e

o f  Colorado, do hereby certify that

_____**KEVIN SCOTT HANNON**_____

has been duly licensed and admitted to practice as an

**ATTORNEY AND COUNSELOR AT LAW**

within this State; and that this name appears upon the Roll of Attorneys

and Counselors at Law in my office of date the ___**14**<sup>th</sup>___

day of **November**_____ A.D. ___**1986**___ and that at the date hereof

the said ___**KEVIN SCOTT HANNON**___ is in good standing at this Bar.

**IN WITNESS WHEREOF**, I have hereunto subscribed my name and

affixed the Seal of said Supreme Court, at Denver, in said State, this

___**2**<sup>nd</sup>___ day of_____**February**_____ A.D.___**2024**_____

**Cheryl Stevens**
_____
Clerk

By_____Myna Sanchez_____

Deputy Clerk

**Ex. 1**

# Supreme Court of the United States
## OFFICE OF THE CLERK
## WASHINGTON, D.C. 20543



# KEVIN SCOTT HANNON
# OF DENVER, CO

was duly admitted and qualified as an Attorney and Counselor for the Supreme Court of the United States

on the seventeenth day of October, in the year one thousand nine hundred and ninety-four, and is now a

member of the Bar of this Court in good standing.



In testimony, whereof, as Clerk of said

Court, I have hereunto set my hand and

affixed the seal of said Court, at the City

of Washington, this twentieth day of

March 2024.

*Scott S. Harris*
*Clerk of the Supreme Court*
*of the United States*

By

Assistant Admissions Officer

**Ex. 1**

*The Supreme Court of Missouri*



## *Certificate of Admission as an Attorney at Law*

I, Betsy AuBuchon, Clerk of the Supreme Court of Missouri, do hereby certify that the records of this office show that on 3/3/1998,

## *Kevin Scott Hannon*

was duly admitted and licensed to practice as an Attorney and Counselor at Law in the Supreme Court of Missouri and all courts of record in this state, and is, on the date indicated below, a member in good standing of this Bar.

IN TESTIMONY WHEREOF, I hereunto set my hand and affix the seal of the Supreme Court of Missouri at my office in Jefferson City, Missouri, this 12th day of March, 2024.

Clerk of the Supreme Court of Missouri

**Ex. 1**



**THE UNITED STATES OF AMERICA**

**for the Tenth Circuit**

I, Christopher M. Wolpert, Clerk of the United States Court of Appeals for the Tenth Circuit,

**DO HEREBY CERTIFY** that Kevin Hannon was

duly admitted to practice before this Court on December 12, 1986,

and is in good standing. There have been no disciplinary actions instituted in this court.

Dated at Denver, Colorado, on March 11, 2024.

CHRISTOPHER M. WOLPERT

Clerk of Court

By _S. Thieme_

Deputy Clerk

**Ex. 1**

# CERTIFICATE OF THE CLERK OF THE SUPREME COURT OF THE STATE OF WYOMING

---

I, Shawna Goetz, Clerk of the Supreme Court of the State of Wyoming, hereby certify that, according to the records of my office:

## Kevin Scott Hannon

was, on the 10th day of December, 2014, duly admitted and licensed to practice as an attorney and counselor at law in all the courts of Wyoming; and is currently an active member of the Wyoming State Bar in good standing.



Given under my hand and the seal of said Court this 11th day of March, 2024.

Shawna Goetz, Clerk

by deputy

**Ex. 1**



# Certificate of Good Standing

United States District Court
District of Colorado

I, Jeffrey P. Colwell, Clerk of the United States District Court
DO HEREBY CERTIFY

## Kevin S. Hannon

Admission date: 11/19/1986

was admitted to practice in this court
and is in good standing.

Dated: March 12, 2024

**Ex. 1**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

# *Certificate Of Good Standing*

I, Erin P. Callahan, Deputy Clerk of the United States District

Court for the District of New Hampshire, do hereby certify that

## Kevin Hannon

with New Hampshire Bar #269896 was admitted to practice in this

Court on April 10, 2018, and is in good standing as a member of the

bar of this Court.

Dated at Concord, New Hampshire, on March 14, 2024.



DANIEL J. LYNCH, Clerk

By: *El. Callahan*
Erin P. Callahan
Deputy Clerk

*The issuance of this Certificate of Good Standing is based on this attorney's representation that he/she is an active member in good standing of the bar of the New Hampshire Supreme Court or the bar of the highest court of any state, and that no disciplinary matters are currently pending against said counsel in any jurisdiction. Should that representation prove to be untrue as of the above date, this certificate is rendered null and void.*

**Ex. 1**

# CERTIFICATE OF GOOD STANDING

UNITED STATES OF AMERICA       )

                                                 )   SS.

WESTERN DISTRICT OF MISSOURI    )

I, Paige Wymore-Wynn, Clerk of the United States District Court for the Western District of Missouri, DO HEREBY CERTIFY that

## Kevin Hannon

was duly admitted to practice in said Court on

## March 1, 2005

and is currently an active member who has not been disciplined by this Court.

Dated at Jefferson City, Missouri

on March 14, 2024

*Paige Wymore-Wynn*

Paige Wymore-Wynn, Clerk of Court

By:    *M. Warren*

Melissa Warren, Deputy Clerk

**Ex. 1**



**WISCONSIN SUPREME COURT**
OFFICE OF THE CLERK
110 E. Main Street, Suite 215
P.O. Box 1688
Madison, WI 53701-1688

Telephone: 608-266-1880
TTY: 800-947-3529
Fax: 608-267-0640
http://www.wicourts.gov

Samuel A. Christensen
Clerk

## *CERTIFICATE OF GOOD STANDING*

*I, Samuel A. Christensen, Clerk of the Supreme Court of Wisconsin certify that
the records of this office show that:*

*KEVIN S. HANNON*

*was admitted to practice as an attorney within this state on July 16, 1999 and is
presently in good standing in this court.*

*Dated: March 18, 2024*

*SAMUEL A. CHRISTENSEN
Clerk of Supreme Court*

AP-7000, 03/2005 Certificate of Good Standing

**Ex. 1**



# United States Court of Appeals

### For the

## First Circuit



## Certificate of Good Standing

I, Maria R. Hamilton, Clerk of the United States Court of Appeals for the First Circuit, do hereby certify that Kevin Scott Hannon was on the twenty-seventh day of December, in the year of our Lord, two thousand and sixteen, admitted to practice as an Attorney and Counsellor for the United States Court of Appeals for the First Circuit, and that said Attorney has ever since been in good standing.

**In Testimony Whereof,** I hereunto subscribe my name and affix the seal of the United States Court of Appeals for the First Circuit, this thirteenth day of March, in the year of our Lord, two thousand and twenty-four.



_Maria R. Hamilton_

Clerk of the United States Court of Appeals for the First Circuit

**Ex. 1**

# *United States District Court*
# *Western District of Wisconsin*



# Certificate of Good Standing

I certify that Kevin Hannon was duly admitted to practice in the United States District Court for the Western District of Wisconsin on September 25, 2023 and is in good standing in this court.

Dated this 20th day of March, 2024.

Joel Turner, Clerk of Court

By _____
Deputy Clerk

# In the United States Court of Federal Claims

I, Lisa L. Reyes, Clerk of the United States Court of Federal Claims, do hereby certify *Kevin Scott Hannon* Esquire was on *June 08, 1985,* duly sworn, enrolled and admitted as an attorney of the United States Court of Federal Claims; and on this date is a member of the United States Court of Federal Claims bar in good standing, as appears from the records and files of this office.

IN TESTIMONY WHEREOF I have hereunto subscribed my hand and affixed the seal. of said Court at Washington, D.C., this 21st Day of March, A.D., 2024.

Lisa L. Reyes, Clerk

**Ex. 1**

# CERTIFICATE OF GOOD STANDING

United States of America    *
     Court of Appeals    *    ss.
     for the Eighth Circuit    *

I, Stephanie N. O'Banion, Acting Clerk of the United States Court of Appeals for the Eighth Circuit, DO HEREBY CERTIFY That **Kevin Hannon** was duly admitted to practice in said Court on **November 25, 1998** and is in good standing in said Court.

**Dated at St. Louis, Missouri**

**on April 8, 2024.**

*Stephanie O'Banion*
**Acting Clerk of Court**

By *Amy Smith*
     **Deputy Clerk**



**Ex. 1**




# United States District & Bankruptcy Courts
## for the District of Columbia
CLERK'S OFFICE
333 Constitution Avenue, NW
Room 1225
Washington, DC  20001

I, **ANGELA D. CAESAR,** Clerk of the United States District Court

for the District of Columbia, do hereby certify that:

## KEVIN HANNON

was, on the ___18th___ day of ___March___ A.D. ___2019___ admitted  to

practice as an Attorney at Law at the Bar of this Court, and is, according to

the records of this Court, a member of said Bar in good standing.

In Testimony Whereof, I hereunto subscribe my name and affix the seal of

said Court in the City of Washington this ___16th___ day of ___April___

A.D. ___2024___.



**ANGELA D. CAESAR,** Clerk of Courts

By: ___Kia R. Langford___

**Deputy Clerk**

**Ex. 1**

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 12:22 PM
KATHLEEN VIGIL CLERK OF THE COURT
Anna M Martinez

STATE OF NEW MEXICO
_____Santa Fe_____COUNTY
_____1st_____JUDICIAL DISTRICT

____Jennifer Steketee_____,                         No. __D-101-CV-2024-00569__

v.

____3m, et. al._____.

### AFFIDAVIT OF NON-ADMITTED LAWYER

STATE OF ___Colorado_____)
                                                          )
COUNTY OF _Denver_____)

____Kevin S. Hannon_____, (Non-admitted Lawyer) the affiant herein, having been
duly sworn, states upon oath:

1. Affiant is admitted to practice law and is in good standing to practice law in
   ____Colorado, United States____ (state, territory, country).

2. Affiant has complied with Rule 24-106 NMRA.

3. Affiant has associated with ____Damon Hudson_____, counsel licensed to practice
   law in good standing in New Mexico.

*Kevin Hannon*, Affiant, being first duly sworn, states upon oath, that all of
the representations in this affidavit are true as far as affiant knows or is informed, and
that such affidavit is true, accurate and complete to the best of affiant's knowledge and
belief.

DATED: __5/10_____, 2024.

                                                          _____
                                                          Affiant

SUBSCRIBED AND SWORN TO before me this _10th_ day of _May_ _2024_

                                                          _____
                                                          NOTARY PUBLIC

My commission expires:

__3/31/2025_____

Cynthia S. Knowles
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID# 20094010390
MY COMMISSION EXPIRES 03/31/2025

**Ex. 2**

STATE OF NEW MEXICO

COUNTY OF SANTE FE

District Court

First Judicial District

Case No. D-101-CV-2024-00569

JENNIFER STEKETEE; for herself and on behalf of all
others similarly situated

                    Plaintiffs,

vs.

THE 3M COMPANY (f/k/a Minnesota Mining and
Manufacturing Co.) et al.,

                    Defendants.

**AFFIDAVIT OF SERVICE**

State of Minnesota)
County of Stearns)SS

I, Jean Dotzler, being over the age of 18 and not a party to this action, hereby certify and return that I served the CLASS ACTION COMPLAINT FOR PROPERTY RELATED DAMAGES AND DEMAND FOR JURY TRIAL; PLAINTIFFS' 6-PERSON JURY DEMAND; SUMMONS in the above titled action.

Upon: THE 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.)

At:

                    CORPORATION SERVICE COMPANY
                    2345 RICE STREET, SUITE 230
                    ROSEVILLE, MN 55113
                    RAMSEY County Minnesota

On:

                    April 25, 2024, at 10:43 am

By handing to and leaving with CHRISTINA OLUND, a MANAGING AGENT who is authorized to accept service a true and correct copy thereof.

I declare under penalty of perjury that everything I have stated in this document is true and correct. Minn. Stat. § 358.116.

_____
Jean Dotzler
Arden Process Services L.L.C.


April 25, 2024
Date

# RETURN OF SERVICE

1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 2:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Alycia  E Alvarez

State of New Mexico

County of Santa Fe County

I, Sheryl J. Bacon, of lawful age, being first duly sworn, deposes and states; I am duly licensed as a private process server under 12 O.S. Supp §158.1; that I received the foregoing Summons, Complaint, and Jury Demand Index # *D-101-CV-2024-00568* on the *23rd* day of *April* 20*24*.

## PERSONAL SERVICE

That I delivered a copy of said Summons, Complaint, and Jury  Demand to each of the following named defendants personally at the address and on the date set forth opposite each name to wit:

| Name of Defendant(s) | Address | Date of Service |
|---|---|---|
| | | |
| | | |

## USUAL PLACE OF RESIDENCE

…and that on _____, I served _____ by leaving each a copy of the said Summons, Complaint, and Jury  Demand at _____ _____,which is his usual place of residence, with _____, _____ , a member of his household over fifteen (15) years of age.

## CORPORATION RETURN

…and commanded therein, I summoned the within named defendant, as follows, to wit: *Deepwater Chemicals* , at *1833 S. Morgan Road, OKC OK 73128* , a corporation, on the *24th* day of *April* , 20*24* by delivering a true and correct copy of the within Summons, Complaint, and Jury Demand hereof with endorsement thereon to *CT Corporation* , he being the *Registered Agent* of said corporation.    *Amy Stowe*

☐ Party served provided that the defendant is a single person.

Military Status ☐ No  ☐ Yes  Branch_____

## NOT FOUND

I certify that the following persons of the defendant(s) within named not found in said county: _____
=====================================================================================

_Sheryl J. Bacon_ _____    License #  PSS-2022-33
Sheryl J. Bacon           Private Process Server

Subscribed and sworn to before me this *24th* day of *APRIL* , of 20*24*

State of Oklahoma
County of Oklahoma
My Commission Expires:

_____
NOTARY PUBLIC

DWAYNE E. GILLESPIE
NOTARY PUBLIC
# 13008700
EXP. 09/20/25
STATE OF OKLAHOMA

D-101-CV-2024-00569

**AFFIDAVIT OF SERVICE**

| Case: | Court:<br>First Judicial District | County:<br>Santa Fe County, NM | Job:<br>10947559 |
|---|---|---|---|
| Plaintiff / Petitioner:<br>JENNIFER STEKETEE | | Defendant / Respondent:<br>ARKEMA INC, 900 First Avenue King of Prussia, PA 1940 | |
| Received by:<br>MONTCO Constable Services LLC | | For:<br>Registered Agent | |
| To be served upon:<br>ARKEMA INC | | | |

I, Karen Ludwig, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:   Lois Gray on behalf of ARKEMA INC , Company: 900 First Ave, King of Prussia, PA 19406
Manner of Service:   Corporation, Apr 26, 2024, 1:12 pm EDT
Documents:   Summons and Complaint (Received Apr 22, 2024 at 2:10pm EDT)

Additional Comments:

1) Successful Attempt: Apr 26, 2024, 1:12 pm EDT at Company: 900 First Ave, King of Prussia, PA 19406 received by Lois Gray on behalf of ARKEMA INC . Age: 50; Ethnicity: Caucasian; Gender: Female; Weight: 135; Height: 5'5"; Hair: Blond; Eyes: Green; Relationship: Receptionist; Served the person in charge of the office or business.

_Karen Ludwig_          4/27/24

Karen Ludwig                     Date

MONTCO Constable Services LLC
600 Gary Lane
Norristown, PA 19401
484-602-8267

## AFFIDAVIT OF SERVICE

| Case:<br>D-101-CV-2024-00569 | Court:<br>First Judicial District - Santa Fe New Mexico | County:<br>Santa Fe, NM | Job:<br>10917725 |
|---|---|---|---|
| Plaintiff / Petitioner:<br>Jennifer Steketee | | Defendant / Respondent:<br>The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), et al | |
| Received by:<br>Dane County Civil Process, LLC | | For:<br>Singleton Schreiber | |
| To be served upon:<br>The Chemours Company, c/o CT Corporation System | | | |

I, Michael Jesse, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:** Barb DeJongh, Clerk, CT Corporation System, Registered Agent Company: 301 South Bedford Street Suite 1, Madison, WI 53703

**Manner of Service:** Registered Agent, Apr 24, 2024, 11:48 am CDT

**Documents:** Summons (Received Apr 23, 2024 at 1:00pm CDT), Class Action Complaint for Property Related Damages and Demand for Jury Trial

**Additional Comments:**
1) Successful Attempt: Apr 24, 2024, 11:48 am CDT at Registered Agent Company: 301 South Bedford Street Suite 1, Madison, WI 53703 received by Barb DeJongh, Clerk, CT Corporation System. Age: 60; Ethnicity: Caucasian; Gender: Female; Weight: 155; Height: 5'5"; Hair: Gray; Served.

Fees:   $62.05

| | |
|---|---|
| Michael Jesse | 04/25/2024 |
| | Date |

Dane County Civil Process, LLC
345 W Washington Ave Suite 332
Madison, WI 53703
608-849-6420

Subscribed and sworn to before me by the affiant who is personally known to me

Notary Public

| 04/25/2024 | 07/20/2026 |
|---|---|
| Date | Commission Expires |

DAVID OVERLIN
NOTARY
PUBLIC
STATE OF WISCONSIN

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 2:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Alycia  E Alvarez

RETURN OF SERVICE

**DISTRICT COURT: FIRST JUDICIAL DISTRICT**
**SANTA FE COUNTY, NEW MEXICO COURT**
**PO BOX 2268**
**SANTA FE, NEW MEXICO  87504-2268**
**TELEPHONE: 505 855 8160**

Case No. D-101-CV-2024-00569

Judge:  Honorable Maria Sanchez-Gagne /

PLAINTIFFS:  JENIFER STEKETEE

v

DEFENDANTS:  THE 3M COMPANY (f/k/a)
        MINNESOTA MINING AND MANUFACTURING
        CO.) et al

STATE OF NORTH CAROLINA  )
                          ) ss.
City Of Gastonia          )
and County of GASTON      )

I,    BOBBY POOLE              , the affiant, being duly sworn, say: that I
am over the age of eighteen years and am not a party to the within action; and that I
have served the Defendant Buckeye Fire Equipment  Company, true and correct
copy of the SUMMONS  and CLASS ACTION COMPLAINT FOR PROPERTY
RELATED DAMAGES AND DEMAND FOR JURY TRIAL , at 110 Kings Road,
Kings Mountain, North Carolina 28086 on April 23, 2024 at 9:45 a. m. to Ms.
Jackie Gold, authorized agent to accept service for Buckeye Fire Equipment
Company.

Bobby Poole
Allways Express
PO Box 309
Gastonia, NC 28053
704-864-2437

Subscribed and sworn before me on April 23, 2024,

Janet Moser Notary Public
My Commission Expires: 10-13-2025

**AFFIDAVIT OF SERVICE**

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 2:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Alycia  E Alvarez

| Case:<br>D-101-CV-2024-00569 | Court:<br>State of New Mexico First Judicial District Court | County: | Job:<br>10925691 |
|---|---|---|---|
| Plaintiff / Petitioner:<br>Jennifer Steketee | | Defendant / Respondent:<br>The 3M Company,(f/k/a Minnesota Mining and Manufacturing Co.), et al. | |
| Received by:<br>Capital Courier, LLC | | For:<br>Singleton Schreiber | |
| To be served upon:<br>Dynax Corporation c/o CORPORATE SYSTEMS LLC | | | |

I, Isaiah Greene, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**   Dynax Corporation c/o CORPORATE SYSTEMS LLC, 3500 South Dupont Highway, Dover, DE 19901
**Manner of Service:**   Registered Agent, Apr 25, 2024, 12:25 pm EDT
**Documents:**   Dynax - Complaint, Summons and Jury Demand.pdf

**Additional Comments:**
1) Successful Attempt: Apr 25, 2024, 12:25 pm EDT at 3500 South Dupont Highway, Dover, DE 19901 received by Dynax Corporation c/o CORPORATE SYSTEMS LLC. Age: 45; Ethnicity: Caucasian; Gender: Female; Weight: 200; Height: 5'10"; Hair: Brown;
I entered the building of the registered agent and was greeted by Amy Stoffel. Her identity was verified on a previous visit. She checked her computer and then accepted service.

**Fees:**   $89.10

Isaiah Greene                                       Date   5/1/24
1367519

Capital Courier, LLC
PO Box 38
Dover, DE 19903
3028570811

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public   Karen E Elliott

Date   5/1/2024        Commission Expires   11/10/2024

Karen E. Elliott
Notary Public
State of Delaware
My Commission Expires November 10, 2024

CAUSE NO. d-101-cv-2024-00569

| | | |
|---|---|---|
| Jennifer Steketee | § | FIRST JUDICIAL DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| VS. | § | SANTE FE COUNTY, |
| | § | |
| Chemicals Inc. | § | |
| Defendant. | § | NEW MEXICO |

### AFFIDAVIT OF SERVICE

On this day personally appeared **Philip Bart** who, being by me duly sworn, deposed and said:

"The following came to hand on **April 23, 2024, 3:00 pm**,

#### COMPLAINT and JURY DEMAND AND SUMMONS

and was executed at **12321 Hatcherville , Bayton , TX 77520** within the county of **Chambers** at 9:02 AM on **Wednesday, April 24 2024**, by delivering a true copy to the within named

#### TINA GOETSCHIUS - CHIEF FINACIAL OFFICER

in person, having first endorsed the date of delivery on same.

I am a person over eighteen (18) years of age and I am competent to make this affidavit. I am a resident of the State of Texas. I am familiar with the Texas Rules of Civil Procedure as they apply to service of Process. I am not a party to this suit nor related or affiliated with any herein, and have no interest in the outcome of the suit. I have never been convicted of a felony or of a misdemeanor involving moral turpitude. I have personal knowledge of the facts stated herein and they are true and correct."

Philip Bart
Certification Number:182 SCH
Certification Expiration: 7/31/2024

BEFORE ME, a Notary Public, on this day personally appeared **Philip Bart**, known to me to be the person whose name is subscribed to the foregoing document and, being by me first duly sworn, declared that the statements therein contained are within his or her personal knowledge and are true and correct.

SUBSCRIBED AND SWORN TO ME ON **4/24/2024**

Samantha Schumann - Notary Public, State of Texas

SAMANTHA SCHUMANN
Notary ID #126346209
My Commission Expires
June 17, 2024

# CERTIFICATE OF SERVICE

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 2:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Alycia  E Alvarez

**STATE OF NEW MEXICO
COUNTY OF SANTA FE**

Case #: D-101-CV-2024-00569

**Jennifer Steketee**

Plaintiff

**vs.**

**The 3M Company (f/k/a Minnesota Mining and Manufacturing Co.), et al.**

Defendant

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all the times herein mentioned was a citizen of the United States, over the age of 18, not a party to nor interested in the above entitled action, is competent to be witness therein, and that I served copies of the:

**Summons & Class Action Complaint For Property Related Damages and Demand for Jury Trial**

| | |
|---|---|
| PARTY SERVED: | **E. I. DUPONT DE NEMOURS AND COMPANY C/O THE CORPORATION TRUST COMPANY** |
| PERSON SERVED: | **CHIMERE BROOKS, INTAKE SPECIALIST** |
| METHOD OF SERVICE: | **Corporate** - By leaving copies with the person identified above, apparently in charge at the office or usual place of business. I informed him/her of the general nature of the papers. |
| DATE & TIME OF DELIVERY: | **4/24/2024 at 1:29 PM** |
| ADDRESS, CITY AND STATE: | **1209 ORANGE STREET, WILMINGTON, DE 19801** |

Race: **Black**      Sex: **Female**      Age: **43**
Height: **5'3"**      Weight: **180**      Hair: **Brown**      Glasses: **No**

Judicial Attorney Services, Inc.
1201 N Orange St., Ste 714
Wilmington, DE 19801
(877) 659-3448

I declare under penalties of perjury that the information contained herein is true and correct. Executed on 4/24/2024.

_Ramona Talvacchio_
Ramona Talvacchio

CLIENT: **Singleton Schreiber**
FILE #:

Job #: **571296**

FILED  1st JUDICIAL DISTRICT COURT
Santa Fe County
5/13/2024 2:13 PM
KATHLEEN VIGIL CLERK OF THE COURT
Alycia E Alvarez

| **SUMMONS** | |
|---|---|
| District Court: First Judicial District<br>Santa Fe County, New Mexico Court<br>Address:  P.O. Box 2268<br>Santa Fe, NM  87504-2268<br>Telephone:  (505) 855-8160 | Case Number: D-101-CV-2024-00569<br><br>Judge: Honorable Maria Sanchez-Gagne |
| Plaintiffs:  JENNIFER STEKETEE,<br>v.<br>Defendants:  THE 3M COMPANY, (f/k/a<br>Minnesota Mining and Manufacturing Co.), et al. | Defendant Name:<br>CORTEVA, INC.<br>974 Centre Rd.<br>Wilmington, Delaware 19805 |

**TO THE ABOVE-NAMED DEFENDANT(S):** Take notice that:

1.     A lawsuit has been filed against you. A copy of the Class Action Complaint for Property Related Damages and Demand for Jury Trial and Plaintiffs' 6-Person Jury Demand are attached. The Court issued this Summons.

2.     You must respond to this lawsuit in writing. You must file your written response with the Court no later than thirty (30) days from the date you are served with this Summons. (The date you are considered served with the Summons is determined by Rule 1-004 NMRA) The Court's address is listed above.

3.     You must file (in person or by mail) your written response with the Court.  When you file your response, you must give or mail a copy to the person who signed the lawsuit.

4.     If you do not respond in writing, the Court may enter judgment against you as requested in the lawsuit.

5.     You are entitled to a jury trial in most types of lawsuits. To ask for a jury trial, you must request one in writing and pay a jury fee.

6.     If you need an interpreter, you must ask for one in writing.

7.     You may wish to consult a lawyer. You may contact the State Bar of New Mexico for help finding a lawyer at www.nmbar.org; 1-800-876-6227; or 1-505-797-6066.

Kathleen Vigil Dated at ____Santa Fe____, New Mexico, this __12__ day of March, 2024.

CLERK OF COURT

By. _____
Deputy

/s/ Brian S. Colón
SINGLETON SCHREIBER, LLP
Brian S. Colón
Damon J. Hudson
6501 Americas Parkway NE, Suite 670
Albuquerque, NM 87110
(505) 437-5066
bcolon@singletonschreiber.com
dhudson@singletonschreiber.com
*Counsel for the Plaintiff and Plaintiff Class*

/s/ Kevin S. Hannon
Kevin S. Hannon
1641 Downing Street
Denver, CO 80218
(303) 861-8800
khannon@singletonschreiber.com
*Admission Pro Hac Vice to Be Submitted*

THIS SUMMONS IS ISSUED PURSUANT TO RULE 1-004 NMRA OF THE NEW MEXICO
RULES OF CIVIL PROCEDURE FOR DISTRICT COURTS.


**RETURN**[1]

STATE OF NEW MEXICO     )
                            )ss

COUNTY OF   New Castle   )

I, being duly sworn, on oath, state that I am over the age of eighteen (18) years and not a party to
this lawsuit, and that I served this summons in   New Castle   county on the   23rd   day of
  April  ,   2024  , by delivering a copy of this summons, with a copy of complaint
attached, in the following manner:

*(check one box and fill in appropriate blanks)*

[ ]     to the defendant _____ *(used when defendant accepts a copy of
summons and complaint or refuses to accept the summons and complaint)*

[ ]     to the defendant by [mail] [courier service] as provided by Rule 1-004 NMRA *(used when
service is by mail or commercial courier service).*

After attempting to serve the summons and complaint on the defendant by personal service or by
mail or commercial courier service, by delivering a copy of this summons, with a copy of
complaint attached, in the following manner:

[ ]     to _____, a person over fifteen (15) years of age and residing at
the usual place of abode of defendant _____, *(used when the defendant is not
presently at place of abode)* and by mailing by first class mail to the defendant at
_____ *(insert defendant's last known mailing address)* a copy of the summons and
complaint.

[ ]     to _____, the person apparently in charge at the actual place of
business or employment of the defendant and by mailing by first class mail to the defendant at
_____ *(insert defendant's business address)* and by mailing the summons and
complaint by first class mail to the defendant at _____ *(insert defendant's last
known mailing address).*

        Chimere Brooks- Corporaton

[X]     to Trust Company _____, an agent authorized to receive service of process for
defendant Corteva Inc._____.

[ ]    to _____, [parent] [guardian] [custodian] [conservator] [guardian ad litem] of defendant _____ (*used when defendant is a minor or an incompetent person*).

[ ]    to _____ (*name of person*), _____, (*title of person authorized to receive service. Use this alternative when the defendant is a corporation or an association subject to a suit under a common name, a land grant board of trustees, the State of New Mexico or any political subdivision*).

Fees: _____

_____ - Charles Hall
Signature of person making service

_____
Process Server
Title (*if any*)

Subscribed and sworn to before me this  2 4  day of  April   2x24

_____
Judge, notary or other officer
authorized to administer oaths

notary
Official title

USE NOTE

1.    Unless otherwise ordered by the court, this return is not to be filed with the court prior to service of the summons and complaint on the defendant.

2.    If service is made by the sheriff or a deputy sheriff of a New Mexico county, the signature of the sheriff or deputy sheriff need not be notarized.

[Adopted effective August 1, 1988; as amended by Supreme Court Order 05-8300-01, effective March 1, 2005; by Supreme Court Order 07-8300-16, effective August 1, 2007; by Supreme Court Order No. 12-8300-026, effective for all cases filed or pending on or after January 7, 2013; as amended by Supreme Court Order No. 13-8300-022, effective for all cases pending or filed on or after December 31, 2013; as amended by Supreme Court Order No. 14-8300-017, effective for all cases pending or filed on or after December 31, 2014.]